THE COLUMBIA.

THE R. H. WILLIAMS, Jr.

BROWN *v.* THE COLUMBIA and another.

CONTINENTAL INS. CO. *v.* SAME.

*(District Court, S. D. New York.* January 31, 1887.)

1. COLLISION—PROXIMATE AND REMOTE CAUSES—NAVIGATING NEAR PIERS AND SLIPS—STATE STATUTE.

Although navigating contrary to the statute does not necessarily charge the vessel with fault in a collision, where her position was perceived in time, and there was plenty of space and opportunity for each to avoid collision, yet it will be deemed a fault, and one of the proximate causes of the collision, when the violation of the statute has created embarrassment in the movements of either vessel.

2. SAME—RULE 19—ASSENTING SIGNALS.

A steamer having another crossing steamer upon her own starboard hand is not relieved of her duty to keep out of the other's way, under rule 19, merely from receiving first a signal of two whistles from the other, which are assented to, indicating that they will pass starboard to starboard. She remains, as before, bound to do all that she reasonably can to keep out of the way.

3. SAME — FERRY-BOAT — EAST RIVER — CIRCLING COURSE — NOT STOPPING AND BACKING.

The ferry-boat C., on leaving her slip in Brooklyn, bound for the Catharine-street slip, New York, observed the tug W. coming up with the flood-tide, close to her New York slip. The river is so narrow that on that tide a ferry-boat, under a hard a-starboard helm, is sometimes scarcely able to make her necessary downward turn, circling around somewhat in the shape of the letter "S." The C. gave the W. a signal of two whistles, indicating that she should go outside of her, to which the W. replied with two. The W. properly sheered somewhat further towards the New York shore, and as near as was prudent with a tow along-side, and slowed, but did not back. The danger of collision was perceived when they were from 600 to 900 feet apart. The C. was all the time under a hard a-starboard wheel, but did not turn fast enough to clear the W.'s tow, striking her with her starboard wheel or wheel-house, and sinking her immediately. *Held,* both were in fault,—the ferry-boat as being specially charged with knowledge of what she could do or not do in turning, and therefore bound to stop and back in time, when the danger was perceived; and the tug (1) for navigating unlawfully near the piers and slips, which created an embarrassment to the ferry-boat, and prevented her going to the westward of her, following her ordinary course, while she was not able, without stopping, to turn rapidly enough to go to the eastward; (2) for not back-

ing when the danger of collision was perceived; and (3) that it was immaterial that the two whistles were given first by the C., and that the tug was not thereby relieved from her duty to keep out of the way, having the other on her starboard hand, by the use of all reasonable means within her power.

In Admiralty.

*Hyland & Zabriskie*, for libelant.

*B. D. Silliman*, for the Columbia.

*Charles Murray*, for the Williams.

*Carpenter & Mosher*, for Insurance Co.

BROWN, J. At about half past 1 in the afternoon of February 12, 1886, as the canal-boat Mary Brown, loaded with coal, was going up the East river, in tow of the steam-tug R. H. Williams, and lashed upon the tug's starboard side, she came into collision with the ferry-boat Columbia, not far from Pier 39, and within less than 300 feet of the shore. The ferry-boat was upon one of her regular trips from Main street, Brooklyn, to Catharine street, New York. At the time of the collision the tug and tow were headed nearly straight up river, probably a little towards the New York shore, and the ferry-boat nearly straight down, probably a little towards the Brooklyn shore. The after-corner of the starboard wheel-house of the ferry-boat, or the paddle-wheel itself, struck the starboard side of the canal-boat a little forward of the after-cabin, causing the latter to sink immediately. The above libels are filed for the loss of the boat and cargo, respectively.

The river at the point of collision is only about 1,400 feet wide. Ferry-boats on the flood-tide, under a hard a-starboard wheel from the start, require nearly the whole width of the river to turn in, their course being like the letter "S," and varying somewhat with the wind and strength of the current. The pilot of the tug observed the ferry-boat when she left her slip. The tug, he says, was then about 300 feet from the New York shore, and opposite, or a little above, the Catharine ferry-slip. He testifies that the ferry-boat, soon after leaving her slip, on the Brooklyn side, gave him a signal of two whistles, indicating that she would pass outside of him, to which he replied with two, and immediately starboarded his wheel, and steered further in towards the New York shore; that when the ferry-boat was somewhat more than half way across the river, observing that she had turned down but little, if any, he was apprehensive of collision, and again gave a signal of two whistles, to which the ferry-boat immediately replied with two; that he kept in shore as near as it was possible, passing within some 10 or 20 feet of some barges that lay moored at the end of Pier 39; and that the collision occurred when he was just above that pier, after he had stopped his engine.

The witnesses for the ferry-boat deny that there was more than one exchange of signals, the time agreeing mostly with the second signals testified to by the tug's witnesses. It is more probable that there was also a prior exchange of signals, as testified to by the tug's witnesses, which were forgotten by the witnesses for the ferry-boat. That is, however, immaterial. I am satisfied that the last signals exchanged were in

abundant time for either boat to have avoided the collision by suitable precautions.

1. The chief point in defense of the ferry-boat is that the tug, after the exchange of whistles, did not sheer at all to port, as she might and should have done; that the Columbia had a right to count upon this; and, had the tug so sheered, the collision would not have occurred. Conceding that, under the circumstances, the tug was bound to sheer to port, in accordance with her signal, so far as was reasonable and prudent, the evidence on her part, sustained also by disinterested witnesses, proves that she did sheer considerably to port, and that this point in defense of the ferry-boat is not sustained.

The present case, on both sides, illustrates forcibly the rule of evidence so frequently applied to the testimony of witnesses on the water, concerning the movements of other vessels, that such testimony must be received with great caution, when the vessels are changing their relative positions; and that, in general, the statements of a vessel's own witnesses in regard to her own movements are to be accepted, unless there be something improbable in their story, or they be in some other way discredited than by the mere appearance of her own motions to those on board of another moving vessel. The ferry-boat in this case was not only changing her position constantly, but was all the time upon the turn under a hard a-starboard wheel; though all testify, and no doubt were honestly of the opinion, that the tug did not sheer to the westward, but kept straight up the river. In like manner, the tug's witnesses also, for a considerable time, did not perceive the constant change of heading which the ferry-boat was making, and the tug's second and last signal was given because her change was not, and could not be, properly seen and appreciated.

However much of the river may have been needed for the ferry-boat's turn, her own pilot, knowing her accustomed motion, and familiar with her handling, was, in a much more special degree than the tug's pilot, bound to calculate upon her course in rounding, and was chargeable with knowledge of what he could do, and what he could not do, in turning, and to allow accordingly the proper margin for safety. *The Drew*, 25 Fed. Rep. 457. Upon the circling course which the ferry-boat must pursue, the tug, on the contrary, could not calculate with any precision. If a reasonable margin of safety could not clearly and certainly be made by the ferry-boat in her turn under a hard a-starboard wheel, it was her pilot's plain duty to stop and back betimes, so as to get a different heading for his rounding course. He should have known what he could do, and should not have kept on. When the last signals were exchanged, the two boats were from 600 to 900 feet apart. The tug was going very slowly, for the latter part of the interval, under a slow bell, or stopping. The ferry-boat could come to a dead stop in the water within 400 feet; so that, whatever the tug's fault, there was no need of the collision. The ferry-boat could have avoided it, and was bound to do so by backing in time. *The Fanwood*, 28 Fed. Rep. 373.

As the ferry-boat was under a hard a-starboard helm, she must have

swung, after the time when the last whistles were exchanged, several points before the collision; which shows that at the time of those whistles she could not have been heading, as her witnesses state, nearly down river, but, in my judgment, at least two to three points towards the New York shore, since all the witnesses say she was heading but little, if any, towards the Brooklyn shore at the time of the collision. The evident errors and inconsistencies of several of the ferry-boat's witnesses, in respect to her heading and slight change of course from the time of the last two whistles, detract much from the reliance to be placed upon the details of their testimony, though their general account is doubtless correct. It is sufficient, however, for the present case, to say that the ferry-boat, having undertaken by her signal of two whistles to go outside of the tug, was bound not to crowd the tug too near to the New York shore; and that she was bound to stop and back in time, if she could not leave the tug a reasonable margin for safety in going along the shore with her tow along-side. I am satisfied that the tug, after the whistles, did at once sheer further towards the New York shore, and as much so as the ferry-boat, under the circumstances, had any right to count upon, and that the ferry-boat is therefore to blame for not stopping sooner, as she might have done, and was bound to do.

2. The tug was navigating in close proximity to the ferry slip and piers in violation of the state statutes, which required her to go "as near mid-river as may be." That circumstance alone, however, if it in no way interfered with the navigation of either vessel so as to tend to bring about the collision, has been in several cases held to be immaterial. Where there is ample time and space and opportunity for navigation, and for avoiding each other, such prior faults are regarded as remote and not proximate causes, and hence immaterial. *The Dexter*, 23 Wall. 69, 76; *The Favorita*, 8 Ben. 11; *The F. M. Wilson*, 7 Ben. 367; *The Delaware*, 6 Fed. Rep. 195; *The Nereus*, 23 Fed. Rep. 457; *Cayzer* v. *Carron Co.*, 9 App. Cas. 873. In many other cases, where the position of the boat unlawfully navigating near the slips and piers has created embarrassment in the movements of either, so as to be in direct connection with the collision as one of its proximate causes, the violation of the statute has been uniformly treated as a legal fault. *The Favorita*, 8 Blatchf. 539; *The Maryland*, 19 Fed. Rep. 551; *The Columbia*, 8 Fed. Rep. 716; *The Monticello*, 15 Fed. Rep. 474; *McFarland* v. *Selby, etc., Co.*, 17 Fed. Rep. 253; *The Uncle Abe*, 18 Fed. Rep. 270; *The John S. Darcy*, 29 Fed. Rep. 644.

In the present case, it cannot be doubted, I think, that the position of the tug opposite and near to the ferry-boat's slip in New York, when the ferry-boat left the Brooklyn side, was a plain embarrassment to her navigation. Her precise nearness to the shore could not then be determined by the ferry-boat. Each was bound by the inspectors' rules to give signals indicating on which side of the other she should go. The ferry-boat chose the signal of two whistles, undertaking to go outside of the tug. This signal was no doubt justifiable, as there was not room, considering the other boats between the tug and the New York

shore, to go inside of her; while if the ferry-boat's testimony is to be believed, that her wheel was all the time hard a-starboard, the result proved that she had not room to turn and go outside of the tug. Had the tug been in mid-river, where the law required her to be, there would have been no embarrassment of this kind; the ferry-boat could easily have crossed the tug's bows, and had abundant room to go between her and the New York shore, in following her ordinary course. The tug's unlawful place in the river was therefore one of the proximate causes of the collision.

Again, the tug had the ferry-boat on her own starboard hand as the latter was crossing the river. The burden was therefore imposed upon the tug to keep out of the ferry-boat's way. It was immaterial which vessel gave the signal of two whistles first. The ferry-boat admits they were first given by her. The assenting signals of two whistles, given by the tug, did not relieve the tug of her duty to keep out of the way, nor change the burden imposed by the rules of navigation. Doubtless the tug was not bound to go inshore beyond what was safe, but nothing prevented her backing in time. She did not reverse at all. The only excuse given is that doing so would have thrown the bow of the tow out into the river, and exposed her still more to the liability of collision. That would be doubtless true within the last quarter of a minute before the collision. It could not apply half a minute or a minute before the collision, since the backward movement of the tow would take her out of the ferry-boat's way much more than her swing to starboard would carry her in her way. Some time before the collision, as is evident from the pilot's statement, he was apprehensive of collision, because the ferry-boat appeared to be so slow in making her turn. When he first became apprehensive of collision, and when the ferry-boat was at some distance from him, though he knew the necessity of her turning, he took no sufficient steps to give her plenty of room to turn around. He did not slow until within about 300 feet of her, nor stop his engines until somewhat nearer, nor back at all. This was not a compliance with reasonable prudence to avoid the danger the pilot had seen some time before, nor with the express requirement of the twenty-first rule of navigation, to stop and back, when collision is threatened. The tug must, therefore, on these several grounds, be held in fault.

But these faults do not absolve the ferry-boat from blame for similar neglect to reverse in time. Her engineer says that he got the bell to reverse only one-third or half a minute before the collision. The danger was evident some considerable time before that. The ferry-boat cannot be exempt either for delay in reversing, or miscalculation in the rapidity of her swing to port.

The libelant in each case is entitled to a decree against both vessels.