THE SUSQUEHANNA.[1]

THE WM. C. NICOL.

LAWRENCEVILLE CEMENT CO. *v.* THE SUSQUEHANNA and THE WM. C. NICOL.

*(District Court, S. D. New York.   April 31, 1888.)*

1. COLLISION—RIGHT OF WAY—SIGNALS. ·
    A steamer, having the right of way, that seasonably indicates to another by her own original signal of two whistles that the latter shall go ahead of her,

---

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

takes on herself the duty to go astern of the other, and is bound to give way or stop in time to prevent collision, and she is solely responsible if the other keeps on as agreed, and could not, by stopping or backing, avoid collision when the danger of it first appeared.

2. SAME—STOPPING TO AVOID COLLISION.

The ferry-boat S. was crossing the North river, and approaching her New York slip. The tug N., going down stream near the docks, had the ferry-boat below her, and on her starboard hand. The ferry-boat, not noticing the N., blew a signal of two whistles to the tug B., belonging to the same company as the S., and which was going in nearly the same direction, but slightly crossing the S.'s course on her starboard hand. The N. supposed the two whistles were intended for her, and answered with two, as did the B., and the N. kept on to cross the ferry-boat's bow. The latter heard the answer of the N., and a little after repeated her signal of two whistles, and the N. again answered with two. The ferry-boat did not stop or back in time to avoid collision. *Held* that, though the ferry-boat had the right of way by the usual rule, the N. was justified in believing that the S.'s first signal was meant for her, and in going ahead accordingly; and the fact that the ferry-boat, on hearing the N.'s answer, repeated her signal, estopped her from the contention that her first signal was not for the N.; and, as she did not, by stopping in time, avoid the B., the ferry-boat was solely responsible for the collision.

In Admiralty    Libel for damages.

*Wilcox, Adams & Macklin*, for the Susquehanna.

*E. D. McCarthy*, for the Nicol.

BROWN, J.    On the 16th of June, 1885, a few minutes past 4 P. M., as the ferry-boat Susquehanna, from Pavonia ferry, N. J., was crossing the North river, and approaching her slip at the foot of Chambers street, she came in collision with the libelant's canal-boat, which was proceeding down river lashed to the starboard side of the tug Wm. C. Nicol. The forward end of the ferry-boat struck the canal-boat at nearly right angles, probably angling from one to two points only up river, about 25 feet from the stern of the latter, damaging both boats, and injuring the cargo of the canal-boat, for which damage the above libels were filed.    The place of collision was not more than 200 or 300 feet off from the end of pier 20, at the upper side of Chambers-Street slip.    The tug and tow were proceeding nearly straight down river.    The tide was strong ebb, running probably between two and three knots; the weather clear.    As the tug had the ferry-boat on her starboard hand when the necessity of precaution commenced, it was the primary duty of the tug to keep out of the way; and, as the situation of the two boats was known as the fourth or fifth situation under the inspectors' rules, the proper course for the tug would have been to give a signal of one whistle, port her wheel, and go under the stern of the ferry-boat.    There was nothing to prevent this being done.    But when the two were at a distance of at least 1,500 feet apart, the ferry-boat gave a signal of two whistles, which her pilot testifies was designed for the tug Buffalo, which had a railroad float in tow, and belonged to the same line as the Susquehanna, and was on her starboard hand, below her in the river, crossing in nearly the same direction, but heading a little across her bow.    This signal the pilot of the Nicol understood, as he testifies, to be designed for the Nicol.    Both tugs immediately answered with a corresponding signal of two blasts

v.35F.no.4—21

each; that of the Buffalo being a moment first, and that of the Nicol coming "right on top of it." Both answering signals were heard by the pilot of the ferry-boat. He did not immediately give any further signal; but soon afterwards, when probably 600 or 700 feet distant from the Nicol, he gave to her a signal of two whistles, and slowed his engine. The Nicol at once replied with two, and ordered the engineer to go ahead strong. When the boats were 300 or 400 feet apart, the pilot of the Susquehanna rang bells to stop and reverse. The orders were obeyed, but the boats came in collision as above stated. When within about 50 feet of each other, the pilot of the tug put his wheel hard a-port, in order to swing his stern to port as much as possible; but the maneuver was unavailing to avoid collision. If the tug's first signal of two blasts is, under these circumstances, to be treated as an original signal, and not as an answer to the previous similar signal of the Susquehanna, I should be bound to hold the Nicol in fault; because the ferry-boat had the right of way, and was required to keep her course under the rules, and also because she was approaching her slip. The tug was on both grounds primarily bound to keep out of her way; and if her attempt to go ahead of the ferry-boat was a maneuver of her own choosing, with an original signal of two whistles, that course would have been at her own risk. She would have had no right to expect the ferry-boat to change either her direction or her speed until risk of collision was apparent; and, if collision ensued, the tug must in any event have been held in fault for choosing that course, when a safe course astern, in accordance with the rules, was open and unobstructed. *The Greenpoint,* 31 Fed. Rep. 231; *The E. H. Webster,* 22 Fed. Rep. 171.

I think the Susquehanna is in this case, however, estopped from the contention that her own first signal of two whistles should not have been understood by the Nicol as a signal that the tug should go ahead of her. There was nothing in the situation, so far as I can see, that should have led the Nicol to suppose that that signal was intended for the Buffalo and not for her. The course of the Nicol was more threatening to the ferry-boat than was the course of the Buffalo, because the Nicol was coming down with the tide straight across the entrance to the slip. The Buffalo belonged to the same line with the ferry-boat, and the ordinary practice with reference to each other was presumably the better known. That the first signal, under the circumstances, would most naturally have been given to the Nicol, is confirmed by the direct statement of the pilot of the Susquehanna, who testified that, if he had seen the Nicol before signaling the Buffalo, he should first have given a signal of one whistle to the Nicol, indicating that she should go astern of him; and that, after having received her reply, he should then have given a signal of two whistles to the Buffalo. But he was bound to see the Nicol, and the latter's pilot was bound to presume that he was seen, and that the first signal was given to him, as it ought to have been. With this testimony of the two pilots,—namely, that of the Nicol, that he did understand that the ferry-boat's signal was intended for him; and that of the ferry-boat's pilot, that he should have given the Nicol the first signal had he noticed her,—

I do not see how it is possible for the Susquehanna to maintain the position that the Nicol's pilot was not authorized and bound to consider the first signal as a signal to him. Again, had the pilot of the ferry-boat, after hearing the Nicol's immediate reply of two whistles, not been willing that his former signal should be treated by the Nicol as a signal given to her, it was plainly his duty to indicate his design immediately by a new signal of one whistle, which he might instantly have given, and there would then have been abundant time for the Nicol to go astern. But he testifies that, having heard the answer of two blasts from the Nicol, he concluded to "let it stand;" and, not long after, he repeated the same signal, and again received the same reply. The engineer's testimony, and the testimony of other witnesses as to the distance of the two boats at the first exchange of whistles, and the much less distance at the second exchange, shows that the second signal given by the ferry-boat was not given immediately, nor as an answer to the tug's first signal; but as a new and original signal, after the ferry-boat had made a considerable distance towards the New York shore, and some considerable time after the first signal, and that, as a new signal, it was replied to by the Nicol. These subsequent acts of the pilot of the ferry-boat were understood to be, and could only be understood to be, a confirmation of the original signal as a signal designed to direct the Nicol to go ahead, and that the ferry-boat would go astern. The fact, also, that the Nicol's first two blasts, though heard, were not at once answered by the ferry-boat, proves that the pilot of the latter understood them as an answer to his own first two blasts as an original signal. Knowing, therefore, the understanding of the Nicol, and assenting thereto by not immediately dissenting, and confirming it afterwards, as she did, the ferry-boat is estopped from availing herself of the fact that her first signal was really designed for the Buffalo only, which the Nicol did not know and had no right to presume. The case must be treated, therefore, as the signal was understood by the Nicol, and as the pilot of the ferry-boat immediately knew it was understood, namely, as an original signal to the tug to go ahead. The initiative being taken by the ferry-boat with a signal of two whistles, signifying that the tug should go ahead while she would go astern, the cases of *The Greenpoint* and *The Webster* are evidently inapplicable. It would have been a great fault in the tug, after such an agreement, to have done anything to thwart it. She could not lawfully have either gone to starboard under a port wheel, or reduced her speed, except under the pressure of evident and positive necessity, in order to avoid collision. · *The Northfield*, 4 Ben. 112; *The Britannia*, 34 Fed. Rep. 546; *The St. John*, Id. 763.

It was not unlawful, nor a fault in the Nicol, to assent to the ferry-boat's going astern of her, as by her original signal she requested the privilege of doing. When these signals were exchanged there was plenty of time and space for her to do so. It was not for the pilot of the Nicol to debate the reasons which the pilot of the ferry-boat might have for the signal which seemed to be designed for him. It might be that she wished to delay until another boat had left her slip, as is sometimes done; or in

the strong ebb-tide she might have got so far down river that, in order to enter the slip easily, she preferred to starboard strong, and go astern of the tug. It was not unlawful for the ferry-boat, though having the right of way and primarily bound to keep her course, to request the Nicol to go ahead and to allow her to go astern; and when this course was agreed on by the Nicol's reply, and acted on by the latter, the ferry-boat took on herself the duty of going astern of the other, and was bound to give way, and to stop and back, and take seasonably any other measures needful to avoid collision. The pilot of the Nicol had a right to assume that the exceptional signal was given him for good reasons, to act accordingly, and to rely upon the ferry-boat's taking whatever steps were necessary to go astern of him, as she had agreed to do, and as in this case she might easily have done. If the evidence had been sufficient to establish the ferry-boat's further contention that the tug shortly before the collision stopped her engines, I should find her in fault; since this would have been a maneuver in violation of the agreement directly contributing to the collision. The Britannia and The St. John, supra. Such stopping is denied, and there is no evidence of it, except the inferences of some of the witnesses of the ferry-boat derived from the supposed irregularity in the appearance of the exhaust steam. This is too uncertain, as against the positive testimony of those on board the tug, who testify that the only order given affecting speed was to hook up strong. That aided the ferry-boat's going astern, and in no way tended to thwart her. The tug was no doubt navigating nearer to the piers than she had any right to go, and, had she taken the initiative, she would have been required, as I have said, to go to starboard, and to leave the ferry-boat a free course. But the signals in this case were exchanged at a reasonable and sufficient distance. The ferry-boat was then probably about one-third of the way across the river, from the New York shore. The ferry-boat, in effect, took the initiative, and directed the tug to go between her and the shore, and let her go astern. There was abundant time and space for this mode of passing each other, and for the ferry-boat to go astern without embarrassment, as is proved by the fact that after the collision she went on into her slip without difficulty. Under such circumstances, the *proximate* cause of the collision is not the position of one of the vessels in the wrong part of the river, but the bad navigation only. *The F. M. Wilson,* 7 Ben. 367; *The Britannia,* 34 Fed. Rep. 546, and cases there cited; *Cayzer* v. *Carron Co.,* 9 App Cas. 873.

There is some testimony on the part of the ferry-boat that, just before the collision, the tug starboarded her wheel so as to throw her stern against the ferry-boat. But the evidence of the tug's witnesses is that her helm was ported, and not starboarded; and this is to some extent confirmed by the fact that at the collision the tug was pointing a little across the river towards the Central ferry on the Jersey shore; whereas she had previously been pointing about straight down river, or, if anything, working a little towards the New York shore. Several witnesses for the ferry-boat further testify that the quick-water on backing her engines had reached her bows before collision, and from this circumstance it is claimed

that she was actually still in the water; or, as some say, actually moving back towards the Jersey shore. In a large part of the collision cases in this harbor there is similar testimony, and a similar contention on the part of one of the two boats. Nearly always there are other circumstances and testimony, as in this case, which show, either that the witnesses are mistaken as to the time when the quick-water was observed at the bows, or else that that circumstance is not incompatible with the continued forward motion of the boat. That the ferry-boat in this case had some forward motion up to the moment of collision is proved by the fact of her continued approach to the Nicol at nearly right angles; by the nature of the damage done; and by the shock, which was sufficient to be felt by the engineer of the ferry-boat, though the stern of the tug, under her port helm, was swinging, if anything, towards the New York shore. The real cause of the collision was the fact that the lookout of the ferry-boat, though he saw the tug some time before the first signals, did not report her, supposing that his pilot would see her, "as she was plainly visible;" and the fact that the pilot, not having noticed the tug, gave a signal, which, had he observed the tug, would not have been given; and because when, on hearing the tug's answer, he concluded to let his own previous signal stand as a signal to the latter, he did not at once take the necessary measures to go astern, as his signal imported that he would do. I do not find any fault proved against the tug; because, at the time when her pilot first had any reason to apprehend danger, he could do nothing to avert it by stopping or backing, or by the use of his wheel. All he could do was to hook up strong, and this he did. The ferry-boat must therefore be held alone to blame. A decree may be entered accordingly, with a reference to compute the damages, if not agreed upon.