THE NEWBURGH. THE ROBERT J. McGUIRL. Petition of SHAMROCK TOWING CO.

(Circuit Court of Appeals, Second Circuit. April 6, 1921.)

No. 136.

1. Collision ⟜95(2)—Evidence held to show vessels were crossing at small angle and that one substantially kept her course and speed.

Evidence *held* to show that a steamer going up the North River and a tug towing a barge from a point on the Jersey shore to a pier further down the river on the Manhattan side were crossing at a very small angle, and that the tug did little or nothing, but substantially kept her course and speed, after assenting to the steamer's signal for a starboard to starboard passing.

2. Collision ⟜95(4)—Steamer signaling for starboard passing with crossing vessel held at fault in not stopping or in making close shave.

A steamer going up the Hudson river, and colliding with a tug crossing her course at a narrow angle, *held* at fault in not stopping and backing when the tug's answer to her signal for a starboard to starboard passing was too long delayed, or in making too close a shave in her own navigation after the signal was assented to.

3. Collision ⟜93—Burdened vessel, agreeing to proposal of privileged vessel, escapes risk.

When a privileged vessel proposes that the burdened vessel cross her bows, and gets an assent to such proposal, she assumes the risk of the proposal.

---

⟜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**4. Collision ⊂⊃93—Duty of burdened vessel, assenting to proposal of privileged vessel that she cross her bows, stated.**

When a privileged vessel proposes that the burdened vessel cross her bows, and gets an assent to such proposal, the case is one of special circumstances, and the burdened vessel is not rigidly bound to keep her course and speed.

**5. Collision ⊂⊃106—When burdened vessel agrees to cross bows, situation is one of special circumstances.**

Where vessels are crossing at a small angle, and the burdened vessel agrees to cross the bows of the privileged vessel, a position of special circumstances is created, no matter from which vessel the proposal emanates, and the burdened vessel is not absolved from her original duty to keep out of the way, nor rigidly bound to hold her course and speed.

**6. Collision ⊂⊃95(2)—Crossing vessel, assenting to signal for starboard passing and doing little to avoid collision, held at fault.**

Where a steamer going up the Hudson river and a tug towing a barge were meeting at a small angle, and the steamer, the privileged vessel, signaled for a starboard to starboard passing, to which the tug assented, the tug *held* at fault in holding her course and speed, and doing little or nothing to prevent a collision.

Appeal from the District Court of the United States for the Southern District of New York.

Two libels—one by Owen J. McWilliams and others against the Cornell Steamboat Company, which brought in the steamer Newburgh, her engines, etc., claimed by the Central Hudson Steamboat Company; and the others by the Archibald McNeil & Sons Company against the steamer Newburgh, her engines, etc., claimed by the Central Hudson Steamboat Company—with petition by the Shamrock Towing Company, owner of the steam tug Robert J. McGuirl, for limitation of liability. From a final decree, holding the Newburgh and the Robert J. McGuirl jointly at fault for a collision, the Central Hudson Steamboat Company and the Shamrock Towing Company appeal. Affirmed.

This is an appeal from a final decree of the District Court for the Southern District of New York, holding the steamer Newburgh and the tug Robert J. McGuirl jointly at fault for a collision between the barge Blue Star and the Newburgh in the North River on March 25, 1917. On that day the barge Blue Star, lying at Guttenburg, on the Jersey shore of the North River, about opposite Seventy-Ninth street, was taken in tow on the starboard hand of the tug Robert J. McGuirl. She was to be towed to the Forty-Eighth street pier of the Pennsylvania Railroad on the Manhattan side in time to join the tow leaving there for South Amboy at 5 p. m. The McGuirl set out at about the slack of the ebb, shortly before 5 o'clock, and started across and downstream at a rate of about 3 or 4 miles an hour. One of the issues in the case was whether, at the time of the subsequent collision, she was straight down the river or quartering across. Meanwhile the steamer Newburgh had left her pier in Manhattan bound up the North River at a speed of about 14 miles an hour. It is agreed that at all times the Newburgh had the McGuirl on her port bow, and that the Newburgh blew two whistles, to which the McGuirl answered with two.

The McGuirl says that she had turned in the stream above the place of collision, and was headed downstream at a sufficient distance to make a safe port to port passing, that she starboarded after the exchange of whistles, and that the collision occurred through the failure of the Newburgh to do her share towards a starboard to starboard passing. The Newburgh's version is that the McGuirl was still quartering across the river at the exchange, so as to make it a starboard hand case; that the McGuirl, having assented, did not

⊂⊃For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

do her share to co-operate in crossing the Newburgh's bow, porting at the last minute into the Newburgh after an initial starboarding. It is further agreed that the collision occurred by a head-on meeting between the barge and the steamer. At this time the steamer had backed and a large part of her way was off, but she had still enough to plow into the barge, inflicting such injuries that she sank before she could be beached.

There were certain subsidiary proceedings on limitation, responsibility over, and the like, which it is not necessary to set forth, in view of the fact that both vessels have been held at fault.

Herbert Green, of New York City, for the Blue Star.

Duncan & Mount, of New York City (S. C. Fordham, O. D. Duncan, and H. W. Dieck, Jr., all of New York City, of counsel), for the Newburgh.

Alexander & Ash, of New York City (Peter Alexander, of New York City, of counsel), for The Robert J. McGuirl.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City (Robert S. Erskine, of New York City, of counsel), for Cornell Steamboat Co.

Blodgett, Jones, Burnham & Bingham, of Boston, Mass. (Edward E. Blodgett and Albert T. Gould, both of Boston, Mass., of counsel), for certain owners of the barge's cargo.

Before ROGERS and MANTON, Circuit Judges, and LEARNED HAND, District Judge.

LEARNED HAND, District Judge (after stating the facts as above). [1] We think that this was a crossing, not a passing, case. We must choose between the story of the Newburgh, backed up by Eldridge, and the supposition that each vessel was passing the other port to port on directly opposite courses 300 feet apart. If so, it seems to us highly improbable that the Newburgh should ever have sought a starboard to starboard passing, even though we should agree that, had she done so, the McGuirl would have assented. The suggestion that the Newburgh meant to avoid the New York shore further up because of possible shipping appears fantastic. On the other hand, it seems hard to accept Eldridge's story that the McGuirl was heading only two points downstream, because not only does it contradict the story of the McGuirl, but there was no conceivable reason for her still so doing half a mile below Guttenburg. Munson says that the McGuirl was headed "about the same" as he, which is consistent with a slight heading on the New York shore. Furthermore, there is no improbability that the McGuirl had already begun to head in towards her slip a mile below; the tide had not yet become a serious factor. Finally, there is every indication that the Newburgh, taken unawares, was presented with a sudden situation which in her judgment demanded some action on her part. The only relative position of the vessels, consistent with that fact, is a crossing case, though at a very small angle, probably about one point.

The learned trial judge believed that the "McGuirl starboarded after accepting the Newburgh's proposal to cross her (the Newburgh's) bows," and in this he is supported by the apparently disinterested tes-

timony of Eldridge. Yet Eldridge heard no signals from the McGuirl, and swore that she starboarded five points at the last moment, which is certainly impossible. His observation must therefore have been faulty. Moreover, we regard it as most unlikely that a burdened vessel, having agreed to cross another's bows, and having started to do so, should in the middle of that movement change and do the exact opposite for no ascertainable reason. We think it much more likely that she relied upon the superior speed and turning power of the Newburgh, and either ported slowly or did nothing at all. It is, of course, possible that her master, after starting to cross, supposed the Newburgh would not follow her signal, and in haste attempted to starboard, yet that presupposes an emergency in his judgment, and such an emergency would ordinarily have called for an alarm on his part. As we are forced to choose between the supposition that she substantially kept her course, or first ported and then starboarded, we accept the former.

[2] These facts being established, it seems to us clear that the Newburgh made too close a shave, or, having a faulty lookout, was taken by surprise, as is made plausible by the short interval between her signals and the little distance left her after the McGuirl's assent. If we were to assume that she did not shave too close, but merely found herself at too close quarters, it would still follow that she had allowed the McGuirl to get too close for safe navigation after she got her assent. Either she ought to have stopped and backed at once, when the answer was too long delayed or without making any such proposal, or she had distance enough to execute her proposal after getting the McGuirl's assent, and failed in her own navigation. In any event, she is in a dilemma which puts her in fault.

[3-5] We have decided that the McGuirl did little or nothing after assenting to the Newburgh's two whistles, but substantially kept her course and speed. Her navigation in this view raises a question upon which we have found very little in the books. It is good law that, when the burdened vessel decides to "keep out of the way" by crossing the bows of the privileged vessel, though she gets an assent to such a proposal, she assumes the risks involved in choosing that method. The Nereus (D. C.) 23 Fed. 448, 455, 456; The Greenpoint (D. C.) 31 Fed. 231. The duty of the privileged vessel in such cases is to co-operate, and she need not keep her course. The Sammie (C. C.) 37 Fed. 907; The M. Vandercook (D. C.) 88 Fed. 559, affirmed 105 Fed. 1004, 45 C. C. A. 183. The situation, at least in this circuit, after the agreement, is one of special circumstances. The George S. Shultz, 84 Fed. 508, 510, 28 C. C. A. 476 (semble). But such an agreement, initiated by the privileged and assented to by the burdened vessel, might be regarded as creating other duties. It could be considered as a proposal that the duties of the vessels should be reversed, and that the burdened (now the privileged) vessel hold her course and speed, so that the privileged (now the burdened) vessel might be able to forecast her positions at future moments, precisely as the rule requires when no agreement has been made.

We have been unable to find much in the books which touches on the precise point. In The Susquehanna (D. C.) 35 Fed. 320, 322, the bur-

dened vessel was exonerated because she did not "thwart" the proposal, having apparently kept her course. On the other hand, in The Columbia (D. C.) 29 Fed. 716, 720, Judge Brown thought it a matter of indifference which vessel proposed the change; the burden always remaining upon the vessel originally burdened. In Stetson v. The Gladiator (D. C.) 41 Fed. 927, Judge Nelson said that the exchange justified the burdened vessel in keeping her course.

In none of these cases was the originally burdened vessel held to any duty to keep her course. On the whole, we are disposed to think that any agreement to change the usual rules should be treated as creating thereafter a position of special circumstances. If so, we think that, although the proposal emanates from the privileged vessel, and should be taken as meaning that she will undertake actively to keep out of the way, it need not absolve the burdened vessel from her similar and original duty also to keep out of the way, nor will it impose on her a rigid duty to hold her course and speed. It is true that that duty is imposed by the rules generally as a correlative to the duty to keep out of the way, but only in cases where no agreement has been reached. Some convention is essential when neither knows the other's purposes, but when both have agreed upon a maneuver by an exchange of signals, their accord should be left for execution by movements adapted to the circumstances. For example, if the angle of crossing is wide, it will usually be best for the originally burdened vessel to hold her course and speed; but, if it be narrow, it is safest for both to starboard and pass at a greater distance. No doubt the proposal involves the proposer in a duty to give a wide enough margin for safety, even though the assenting vessel do not starboard.

[6] In the case at bar the McGuirl, having assented, did nothing, or at most very little, as the position at collision proves. The crossing was at a narrow angle, and the assent involved for safety some active co-operation on her part under those special circumstances. Each was under a duty to keep out of the way of the other, and to this extent the original duty of the McGuirl remained. Her co-operation included more than the mere absence of anything which might "thwart" the Newburgh. Had the angle been wide, her best co-operation might well have been to hold her course and speed. In this respect her fault may have been less than the Newburgh's, who had suggested the change; but upon that we do not feel disposed to speculate. It is enough that the agreement in fact created a situation not much removed from a starboard to starboard passing, in which both vessels have an active duty.

While, therefore, we cannot agree in imputing to the McGuirl the final porting, which the learned trial judge accepted, the result is the same, and both vessels were at fault.

The decree is affirmed, with costs.