## THE P. R. R. NO. 541.

## THE WASHINGTON.

## PENNSYLVANIA R. CO. v. CITY OF NEW YORK et al.

District Court, S. D. New York.

March 7, 1934.

Burlingham, Veeder, Fearey, Clark & Hupper, of New York City (Paul Tison, of New York City, of counsel), for libelant.

Paul Windels, Corp. Counsel, of City of New York (P. F. Shortridge, of New York City, of counsel), for City of New York.

John E. Morrissey, of New York City, for Delaware, L. & W. R. Co.

WOOLSEY, District Judge.

My judgment in this case is that the libel must be dismissed with costs.

I. The pattern of this case is somewhat novel and extremely interesting.

The damage of which the libelant complains was caused on February 8, 1930, at about 6:40 a. m. by the contact between two carfloats which had been proceeding, until the events which I shall mention hereinafter, on substantially parallel courses, rounding the Battery preparatory to going up the East River.

The tide was ebb and was running about two and a half to three miles per hour.

Neither the wind nor the weather operated in any way to cause the collision, and, therefore, need not be discussed.

II. One carfloat, No. 12, belonging to the Delaware, Lackawanna & Western Railroad, was in charge of the Delaware, Lackawanna & Western tug Washington, and the other carfloat, No. 541, belonging to the Pennsylvania Railroad, was in charge of the Pennsylvania Railroad tug No. 18. I shall refer hereinafter to these flotillas as the D., L. & W. flotilla and the Pennsylvania flotilla, respectively.

III. The D., L. & W. flotilla was somewhat ahead of the Pennsylvania flotilla as they came down the North River, but when the former approached a point which might be indicated by a line drawn between the Government ferry slips on Governor's Island and ferry slips on the Manhattan shore (which would approximately pass through a drill then operating seven or eight hundred feet off the Manhattan shore), it went under one bell in order to avoid interfering with the ferryboats that were coming out of the Manhattan slips.

About that time, the captain of the tug Washington observed the ferryboat McCooey, which was leaving the Atlantic avenue docks in Brooklyn and proceeding on its way to its slip at the foot of Whitehall street, and also it then observed that the Pennsylvania flotilla was overhauling the D., L. & W. flotil-

la on its port side at a distance of about 200 to 250 feet therefrom, and, by so much, nearer to the New York shore.

The positions of the flotillas and of the ferryboat at various points, which are of importance in this case, are quite clearly marked in red pencil on the Government blueprint which is Libelant's Exhibit No. 2.

IV. Without going into unnecessary detail, what happened was this:

Less than a minute after the flotillas had observed the McCooey and when the McCooey, having both flotillas on her port hand, was getting well towards the middle of the river on her way to New York, she blew, as I find, a two-blast signal. This signal was taken by the master of the tug Washington, in charge of the D., L. & W. flotilla, which was the nearer of the two flotillas to the McCooey, as an indication that the McCooey, which was, of course, the privileged vessel in this situation, was suggesting that the D., L. & W. flotilla pass ahead of her. The Washington at once responded by a two-blast signal, and although she had been under slow speed at the time when the signal was received, she hooked up and proceeded to commence to carry out the maneuver which she understood to have been initiated by the ferryboat and consented to by herself.

The Pennsylvania flotilla which was proceeding alongside the D., L. & W. flotilla, 200 to 250 feet nearer the Manhattan shore, did not respond to the two-blast signal of the McCooey, but continued her course.

V. Shortly after the two-blast signal the McCooey blew a one-blast signal. Of course, when this one-blast signal was received from the McCooey, it appeared to the Washington that the McCooey's first intention to waive her privilege had been changed and that she intended to re-establish herself as the privileged vessel, and, consequently, that she was proceeding upon her expectable course, angling on somewhat of an arc to the ebb tide, which would enable her to drop down into her berth, in slip No. 7 just below Pier 4 at Whitehall street.

VI. The D., L. & W. flotilla blew alarm signals, reversed at full speed astern, and then blew reversing signals. The Pennsylvania flotilla went astern full speed and blew reversing signals.

VII. The carfloat in the D., L. & W. flotilla was on the starboard side of the tug Washington and was being towed stern first.

The carfloat in the Pennsylvania flotilla was on the port side of the tug P. R. R. No. 18 and was also being towed stern first.

As a result of the reversing by the two tugs, the forward parts of the carfloats were driven together, so that the float No. 12, in charge of the tug Washington, struck with its starboard after corner the float No. 541, in charge of the Pennsylvania tug No. 18, on its port side about 25 feet forward of its stern and caused serious damage.

VIII. The McCooey passed clear by some 25 feet from the end of the D., L. & W. float.

There was a slight contact between the ferryboat and the outboard forward corner of the No. 541, which, as above explained, was the starboard stern corner of that float, but there was not any damage caused to either vessel by this contact.

IX. The libel in this case is brought against the ferryboat McCooey and the tug Washington for the damage caused as above described to the P. R. R. carfloat No. 541.

■ It is perfectly obvious that there was not any conceivable fault on the part of the tug Washington or its float. Cf. The Bronx and The Queens, 250 F. 843 (C. C. A. 2). But it is urged on me that the city as owner of the ferryboat McCooey should be held liable, if not for the whole damage, at least on the basis that both she and the Pennsylvania tug No. 18 were to blame.

This contention is based on the fact that, as the McCooey blew a two-blast signal which was agreed to by the D., L. & W. tug Washington, thus changing the situation in which the McCooey was the privileged vessel into a case of special circumstances, vis-à-vis the D., L. & W. flotilla, The Newburgh, 273 F. 436 (C. C. A. 2), the Pennsylvania flotilla which did not reply to this two-blast signal of the McCooey was entitled to take advantage of the situation created by the agreement between the D., L. & W. tug Washington and the McCooey, and that, therefore, the McCooey had waived her privilege vis-à-vis the Pennsylvania flotilla as well as vis-à-vis the D., L. & W. flotilla.

The captain of the McCooey is now dead, and, consequently, we could not have from his lips at the trial an explanation of his two-blast signal succeeded quickly by a one-blast signal; but I think that this curious sequence of whistles is explained by the conversation which was had between the captain of the McCooey and the captain of the P. R. R. tug No. 18 on the afternoon of the day of the collision.

The captain of the No. 18 states that he went over to the McCooey as she lay in her Brooklyn slip and talked to her captain. The captain of the McCooey said, when he was

0

asked about the two-blast signal which he had blown, that it was blown to the Pennsylvania flotilla—which it will be remembered was between 200 and 250 feet nearer the Manhattan shore than the D., L. & W. flotilla—and that the one whistle was for the D., L. & W. flotilla.

The ferryboat McCooey is a small-sized ferryboat circa 150 feet long, and it is quite possible that her captain thought that he might maintain his privilege vis-à-vis the D., L. & W. flotilla, which was the nearer to him, and waive it vis-à-vis the Pennsylvania flotilla, which was somewhat farther off and which could probably pass ahead of him safely.

The difficulty, of course, was that quite naturally the nearer of the two flotillas assumed that the signal was for it and that the McCooey had waived her privilege as to it.

I think that the circumstances just described explain why it was that after blowing her two-blast signal the ferryboat continued her course and then blew a one-whistle signal.

X. At first I was inclined to consider favorably the contention put forward on behalf of the Pennsylvania flotilla because it seemed quite obvious that the McCooey's two-blast signal led both flotillas not to take earlier steps to stop their engines or reverse and thus avoid impinging too closely on the McCooey's expectable course towards her slip; and also that the result of the subsequent one-blast signal of the McCooey was to make the D., L. & W. flotilla justifiably assume that the McCooey was again reasserting her privilege, with the result that precipitate efforts were necessary on the part of both flotillas in order to avoid collision with her, and that it was the reversing of their engines by both tugs that threw the forward ends of their floats together with the resulting damage mentioned above.

But on reflection and after examining the authorities overnight and hearing arguments this afternoon, it seems to me that it would be most unsafe to hold that the burdened vessel after hearing a two-blast signal from a privileged vessel could proceed without reply and hold the privileged vessel liable for any damage that might ensue.

In order to change a situation of this kind from the situation of a privileged and a burdened vessel to a situation of special circumstance, it is necessary that the burdened vessel should reply with an identic signal and accept the privileged vessel's waiver of the privilege; otherwise, the privileged vessel would never know how she should navigate.

An instance of the waiver of privilege by a privileged vessel, in pursuance of an exchange of signals under the International Rules (33 USCA § 71 et seq.), can be found in the case of Societe, etc., against the United States (The Basse Indre and the Housatonic) 43 F.(2d) 125 (D. C.) in which both vessels were held to blame for not having promptly enough initiated the maneuvers which the respective signals of each indicated to the other.

Consequently, I hold:

1. That vis-à-vis the burdened vessel, the privileged vessel must hold her course and speed until an agreement is reached with the burdened vessel, and

2. That it is not possible for a vessel to claim the benefit of an agreement to waive privilege reached by another vessel which is quite independent of her as the Pennsylvania flotilla seeks to do in this case.

Of course, if there had been a damage caused to the D., L. & W. flotilla by the McCooey, I do not think that there would have been any question but that the McCooey would have been at least in part, if not wholly, to blame for such damage. But that is not the situation here.

XI. I put my decision in this case, therefore, on the ground that the Pennsylvania flotilla did not reply with a two-blast signal to the two-blast signal of the McCooey, and, consequently, that the Pennsylvania flotilla remained throughout the whole situation the burdened vessel. I do not ground my decision in any way on the fact that when the Pennsylvania flotilla overtook the D., L. & W. flotilla it did not exchange any signals therewith.

XII. Confessedly the case is somewhat out of the ordinary owing to the fact that there was a signal agreement between the McCooey and the D., L. & W. flotilla and there was not a signal agreement between the Pennsylvania flotilla and the McCooey and it was the Pennsylvania flotilla that was damaged.

The result is that we have a situation in which vis-à-vis the McCooey the D., L. & W. flotilla has an injuria absque damno and as against the McCooey and the tug Washington, the Pennsylvania flotilla has suffered, if I may so express it, damnum absque injuria.

As curious as this result may seem, I do not think any other conclusion than that which I have reached would be wise or safe in view of the provisions of articles 19 and

23 of the Inland Rules (33 USCA §§ 204, 208) as interpreted by the courts.

XIII. An order providing that this opinion shall stand as the findings of fact and conclusions of law in this cause may be presented for signature either before or at the time when the final decree is noticed for settlement.

The final decree will provide that the libel be dismissed, with costs.