## THE MONTAUK.

### UNION FERRY CO. OF NEW YORK & BROOKLYN v. UNITED STATES.

District Court, S. D. New York.

June 24, 1935.

Macklin, Brown, Lenahan & Speer, of New York City (Gerald J. McKernan, of New York City, of counsel), for Union Ferry Co. of New York & Brooklyn.

F. W. H. Adams, U. S. Atty., of New York City (Charles E. Wythe, Sp. Asst. to U. S. Atty., of New York City, of counsel), for the United States.

GODDARD, District Judge.

This libel was filed by the Union Ferry Company of New York & Brooklyn, as owner of the ferryboat Montauk, to recover damages arising out of a collision which occurred on December 27, 1918, between the ferryboat Montauk and the United States Navy tug Mohave.

The suit by the Ferry Company was brought after a special act enabling it to sue the United States had been passed by the Congress on June 9, 1932 (47 Stat. 1670), as the result of many years of diligent effort on the part of the libelant.

On December 30, 1932, the United States filed a cross-libel to recover damages to its tug, the Mohave, alleged to have been sustained in the collision with the Montauk.

At 12:30 p. m. on December 27, 1918, the Montauk left her slip at the foot' of Hamilton avenue, Brooklyn, bound for the foot of Whitehall street, Manhattan. The tug, Mohave, with a barge in tow on a 125-foot hawser, was bound down heading through Buttermilk Channel. The testimony as to just how the collision occurred and the circumstances which led up to it are meager. However, the testimony is in accord or uncontradicted that shortly after the Mohave and her tow passed, in a port to port passage, a Standard Oil Company tow coming up through the channel, and when the Mohave was about 1,000 feet away from the ferry slip (or as stated by Hirsch, the Mohave's witness, 20 to 25 boat lengths away), and proceeding down about midchannel at the rate of 2½ to 3 knots, the Montauk cleared her slip and headed across the channel toward Manhattan. That the Montauk held her course and speed until just before the collision, when she reversed, and when the Mohave was within 200 feet of the Montauk, the Mohave suddenly sheered to starboard and came in contact with the starboard side of the Montauk about amidships. All the witnesses agree as to this sudden sheer by the Mohave, but there is a sharp disagreement between the witnesses as to the exchange of signals. The collision occurred about midchannel. The wind was light and the tide beginning of flood.

The important issue in the case is what signals, if any, were exchanged between the Montauk and the Mohave; and what their respective duties were.

■ The libelant called one witness, a deck hand who was stationed on the bow of the ferryboat as a lookout, and accounted for its failure to call her captain and her mate, who were on duty at the time, by their death; but a written statement made on the day of the collision by the captain of the Montauk was received in evidence under a stipulation entered into by counsel. The United States called no witnesses and merely offered in evidence, in accordance with the stipulation referred to, testimony adduced in a Naval Board of Inquiry held on May 9, 1919. The only witness testifying at this inquiry who claimed he saw the collision was Hirsch, an electrician on the Mohave, who said he was off duty at the time and was standing on the deck of the Mohave port side aft. The other witnesses testifying at the Naval Inquiry were the Mohave's engineer, machinist mate, and fireman, who were in the engine room at the time; the ship's cook, who was in the galley; and a seaman who was below eating his dinner. Neither the officer in charge of the Mohave's navigation at the time, nor the quartermaster at the wheel, nor a lookout on duty on board the Mohave, were called to testify before the Board of Naval Inquiry, and their testimony, either in oral or written form, was not offered upon this trial, and the failure of the United States to explain why it was not done raises the presumption that the testimony of those who were actually navigating the Mohave would have been unfavorable to the United States, with the exception that counsel stated that the officer in charge of the Mohave had since died.

I find that as the Montauk cleared her slip she blew a two-whistle signal to the Mohave, which was responded to by the Mohave with two whistles. My reason for this conclusion is that Erickson, whom I saw on the witness stand and heard testify, impressed me as a man who was telling the truth. He was in the bow of the Montauk and in a position to observe just what happened and that was what he was there for. He also had as an aid to his recollection a written statement which he made the day when the collision occurred. The written statement of the captain of the ferryboat made on the same day corroborates Erickson's testimony, and it appears from the record that the captain was an experienced and competent master. Opposed to their version, there is only Hirsch's testimony before the Board of Naval Inquiry, who says that the only whistle blown until just before the collision was a one-whistle signal blown by the Mohave and unanswered by the Montauk. Although the court did not have the benefit of seeing Hirsch, it seems to me less likely that he, an electrician off duty standing in the after part of the Mohave, would have been paying, or had much reason to pay, attention to whistles, or would have remembered in the May following the collision, when he was asked about it, that the only whistle he heard was the one whistle from the Mohave. The testimony of Erickson and the statement of the captain of the Montauk that two whistles were exchanged is more convincing than that of Hirsch, who said he only heard one whistle. The testimony of the other witnesses called by the Naval Board of Inquiry adds nothing, as they were below deck and were not paying attention to whistles.

■ The Montauk and Mohave were in a crossing situation. Unless a different agreement was reached between those navigating them, the Mohave had the right of way under the "Starboard Hand Rule" (Inland Rules, arts. 19, 21, and 22 [33 US CA §§ 204, 206, 207]) and the Montauk would have been obliged to stop or go astern of the Mohave, but when the more distant vessel yields her privilege as the Mohave did in responding with two whistles to the Montauk's two whistles, the duties of the vessels are not reversed, but the situation then became one of special circumstances. The P. R. R. No. 18 (The Washington) (C. C. A.) 76 F.(2d) 873, 1935 A. M. C. 666. In The Newburgh, 273 F. 436, at page 439, Judge Learned Hand, speaking for the Circuit Court of Appeals, Second Circuit, says: "It is good law that, when the burdened vessel decides to 'keep out of the way' by crossing the bows of the privileged vessel, though she gets an assent to such a proposal, she assumes the risks involved in choosing that method. * * * The duty of the privileged vessel in such cases is to co-operate, and she need not keep her course."

■ I think that the collision between the Mohave and the Montauk was due to the failure of the Mohave to co-operate in the maneuver and to navigate in such a manner as she might reasonably have been expected to, and particularly to her gross fault in suddenly, when 200 feet away from the Montauk, sheering to her starboard causing her stem to come in contact with the Montauk. Such a sheer, under the cir-

cumstances and unexplained, raises a strong presumption against her. Royal Mail Steam Packet Co. v. Companhia De Navegacao Lloyd Brasileiro (D. C.) 50 F. (2d) 207.

■ The proposal of the Montauk to pass ahead of the Mohave, and consented to by the Mohave, did not involve any great risk if both vessels co-operated. At the time the whistles were exchanged, the Montauk was less than 600 feet from the point where her course would intersect that of the Mohave, and the Mohave was 1,000 feet away from that point. The fact that after the sheer the stem of the Mohave struck the ferryboat about amidships indicates that but for her sheering, the Mohave would have passed astern of the Montauk, and had the Mohave continued her heading toward the Brooklyn shore, as Erickson said she had previously done, it is also clear that there would have been no collision.

I think that the Montauk was not at fault in proceeding on her course under the circumstances; when the Mohave sheered toward her, the Montauk reversed her engines and did all that could be done by her to avoid the collision.

Accordingly, the Union Ferry Company of New York & Brooklyn, as owner of the ferryboat Montauk, may have a decree against the respondent, the United States of America, with the usual reference as to damages, and the cross-libel of the United States against the Ferry Company is dismissed.