LAKE ERIE TRANSP. CO. v. GILCHRIST TRANSP. CO.

(Circuit Court of Appeals, Sixth Circuit. January 3, 1906.)

No. 1,395.

1. COLLISION—STEAM VESSELS MEETING—VIOLATION OF PASSING AGREEMENT.
   Bar Point Light, which marks the mouth of Detroit river is upon a crib in Lake Erie, some distance south of the mouth of the river, and northward from it on the Canadian side of the river at a distance of 2,800 feet is a gas buoy. The water in the lake between the light and the buoy is of sufficient depth for navigation, and it is the custom and usage for vessels either bound in or out of the river to pass between them. *Held*, that an agreement to pass port to port made between a vessel passing out of the river when a half mile north of the light, and a vessel coming in which was a half mile to the east of the light, both being headed toward the light, must be construed with reference to such custom, and required each vessel to keep to the starboard side of the channel between the light and the buoy, and that the incoming vessel was in fault for a collision which occurred 400 feet to the northeast of the light for being on the wrong side of such channel.

2. SAME—PASSING AGREEMENT—USAGE.
   The locality being known as one which, in following the usual custom, required each vessel to turn before their courses would cross, the rule

respecting crossing courses had no application, nor was it a violation of the passing agreement for the outgoing vessel to make the turn to port so as to pass to the north and east of the light.

3. SAME.
One of two vessels which have made a passing agreement is not bound to anticipate that the other will not act lawfully and comply with her agreement, and so long as there is apparently reasonable opportunity for her to do so it is not a fault to act on the assumption that she will.

4. SAME—RISK OF COLLISION.
It is the duty of a vessel to slacken speed, or stop, or reverse if necessary when approaching another, so as to involve risk of collision, but there is no risk of collision within the meaning of the rule so long as the two vessels, by complying with their passing agreement, can certainly pass in safety, and each vessel may be navigated upon this supposition until the intervention of something which should operate as notice to an officer of skill and prudence of the presence of danger.

[Ed. Note.—For cases in point, see vol. 10, Cent. Dig. Collision, §§ 191, 192.]

5. SAME—CONTRIBUTORY FAULT—EVIDENCE TO ESTABLISH.
Where the fault of one vessel for a collision is established beyond question, she is not entitled to a division of damages with the other, except upon clear proof of some fault on the part of the latter, not made in extremis, and reasonable doubts should be resolved in her favor.

6. SAME.
A vessel which in all respects complied with a passing agreement *held* not chargeable with contributory fault for a collision for not anticipating risk of collision and acting thereon sooner than she did.

Appeal from the District Court of the United States for the Eastern District of Michigan.

Roger M. Lee and F. H. Canfield, for appellant.

John C. Shaw, for appellee.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

LURTON, Circuit Judge. The steamer City of Rome, having in tow a schooner bound down Lake Erie, came into collision with the steamer W. S. Mack bound up the lake. The point of collision was near Bar Point Light, which marks the entrance of Detroit river. When the vessels were one mile apart, the City of Rome being one-half mile north of Bar Point light and the Mack one-half mile east of the light, a passing agreement to pass port to port was made. Though neither boat was crowded by any other, and each had proper lights and lookouts, they nevertheless collided in the open lake upon a clear, starlight night, with neither wind nor sea to affect their navigation. The collision occurred at an angle of from 1½ to 2½ points; the port bow of the Mack striking the port side of the Rome forward of amidships. The Rome alone was injured and for her damage libeled the Mack and received full damages. From this decree the owners of the Mack have appealed.

Bar Point Light stands upon a crib out in Lake Erie. It marks the entrance to the Detroit river, although some three miles below its visible banks. There was some evidence tending to show that the dredged navigable channel of some 800 feet in width extending from the mouth of the river proper through the shallow waters of the lake

off the mouth of the river extends all the way to Bar Point Light. But we think the red gas buoy on the Canadian side of the channel, half a mile above the light, marks the beginning of the real channel, for it is shown beyond cavil that the water on the east side of the channel projected to the light is the open lake, and has a depth equal to that of the alleged channel. Vessels bound down Lake Erie, according to the customary usages of navigation, are expected to make a turn when coming out of the river between this gas buoy, 2,800 feet above Bar Point Light, and the light. The depth of the water is such at to make the whole width of this channel favorable for this turn in the course. The same thing applies to vessels coming up the lake and bound up the river, and the passing signals meant that the Rome in making this turn and passing port to port would so turn as to keep on the starboard side of this 2,800 foot channel and keep the Bar Point Light upon her starboard hand.

There was nothing in the nature of the locality or the usages of navigation which gave the Mack any right to expect the Rome to pass upon the westerly side of Bar Point Light. To the Rome the passing agreement meant that the Mack would make the turn as customarily made and keep to the buoy side of the channel. Compliance with this customary usage of navigators at this point was required, and each vessel had a right to expect that the turn would be made in such manner as not to crowd the other. The Vanderbilt, 6 Wall. 226, 18 L. Ed. 823; The Victory, 168 U. S. 410, 421, 18 Sup. Ct. 149, 42 L. Ed. 519. There was no room for serious disagreement as to the duty of these vessels at this locality under their passing agreement, and the evidence reveals the fact that each understood the course which the other would take and her own duty under the passing agreement. How, then, did they so maneuver as to collide with notice of each other's presence and purpose and plenty of water to turn in?

The importance of the locality of collision is most evident, and upon this question there is the sharpest of conflicts in the evidence. The Mack has maintained that the collision occurred very near to the gas buoy. If so, the Mack was on her own side of the water, and the Rome would have grave difficulty in accounting for her failure to direct her course toward the westerly or Bar Point side of the channel. The trial judge, who heard all of the witnesses, found himself unable to accept this view, and fixed the point of collision as in the neighborhood of 400 feet northeast of Bar Point Light. If this is found to be substantially the point of collision, and we see no reason for a different view, it establishes two matters: First, that the City of Rome had directed her course, as she was bound to do, well upon her starboard side of the channel; second, that the Mack had not directed her course to her starboard side, but had crowded over too close before making her turn. This fact establishes the negligence of the Mack. She did not begin to make her turn so soon as she ought to have done in order to direct her course to the starboard or she was too slow in answering her helm for some reason not explained. In either event, she did not comply with the port to port agreement, but

crowded too far over upon the Rome's side of the water. We find no difficulty in agreeing that the Mack was grossly at fault.

The serious question is whether the City of Rome is not also to be condemned for not sooner seeing the danger of collision and taking seasonable steps to avoid it. The rule as to crossing courses has no application to the situation. These vessels knew that each intended to make a turn at or near Bar Point Light, and that the usual and customary course to be attributed to each would keep them clear of each other as a consequence of the agreement to pass port to port. Risk of collision was not involved if each did what it was bound to do under the usage of navigation and particularly under the port to port agreement. The Victory, 168 U. S. 410, 420, 18 Sup. Ct. 149, 42 L. Ed. 519; The Waldo, 100 Fed. 502, 40 C. C. A. 517. But it is said that the City of Rome should be condemned for not doing all she was required to do under the situation to avoid risk of collision. These vessels were one mile or more apart when signals of one blast were exchanged. In view of the locality and the well-understood custom of vessels bound in or out of the river to make the necessary change in course in the vicinity of Bar Point Light, the City of Rome was justified in assuming that the Mack would make the turn in such time as would not involve risk of collision if she should, as customary, make her own turn, leaving the Bar Point Light on her starboard hand. The Mack, when the passing agreement was made, was just about one-half mile, substantially east, below the light. The Rome was about the same distance above or north of the light and each was heading on the light. Thus the course of each vessel, if continued, would lead to and end at Bar Point Light. Their headings were almost at right angles. But, the locality being known as one which required each vessel to make the turn before their courses should cross and the agreement being that this turn should be made port to port, the rule in respect of crossing courses did not apply. The Waldo, 100 Fed. 502, 40 C. C. A. 517.

But it is said that the Rome, after agreeing to direct her course to starboard, did not do so, but starboarded her helm a point or a point and a half when the vessels had come within half a mile of each other, each having up to that time continued to head on the Light.

This alteration of her helm was necessitated in order to go to the eastward of the light house crib upon which the Rome had been directly heading up to that moment. The change in course was only great enough to allow the Rome to pass the Light at about 200 feet on her starboard hand. The Mack should have assumed, under the well known usage of the locality, and of the passing agreement, that the Rome would pass to the eastward of the light and the Rome had a right to assume that the Mack would make her own turn in such a way as to permit this to be done. The master of the Mack upon this matter was asked:

"Q. When the first signals were exchanged between your vessel and the Rome, what is the fact as to whether or not you realized where or about where you and the Rome would have to pass?"

To this he answered:

"A. Why, from the position he was in, I knew he would have to pass some place between the Bar Point and the gas buoy there."

The fact was, and the Mack must be assumed to know, that under the circumstances of the situation the Rome did not agree to direct her course to the starboard of what it then was, but only to the starboard of the usual course in the necessary turning from a southerly to a southeasterly course for vessels bound down Lake Erie.

The Mack's answer thus interprets this agreement by saying:

"As said steamers approached, the City of Rome blew a one blast passing signal to the Mack, indicating that the Rome would direct her course to starboard and follow the westerly and southerly side of said bend, so as to pass on the Mack's port side, and the Mack immediately responded with one blast passing signal, thus indicating to the Rome that the Mack would direct her course to starboard and follow the northerly and easterly side of said bend."

There was, therefore, no fault in starboarding so as to pass east of the light. The place of collision—some 400 feet northeast of the light—indicates that this change of course so as to pass the light on the starboard hand had not carried the Rome away from "the westerly and southerly side of said bend." If any fault is to be attributed to the Rome, it is that she did not seasonably observe the risk of collision arising from the failure of the Mack to make the turn when she should.

The argument which supports this view is, in effect, a confession of the guilt of the Mack, and predicates the claim for a division of damages upon the very flagrancy of her own misconduct. The experienced trial judge, who saw and heard the witnesses, denied a division of damages, and we should be slow upon such a question to reverse his conclusion. But it is said that Capt. Fox, master of the Rome, after starboarding when the two vessels were about one-half mile apart, kept his course until he received and returned a second signal of one blast from the Mack; that he only then realized there was danger of collision, and put his wheel hard aport to give the Mack more room to clear him.

The event shows that this maneuver was made when a collision was well-nigh inevitable. The suggestion that she should have stopped or reversed when she ported was considered by Judge Swan, who concluded that, as she was incumbered with a tow and was so close to the Mack, an effort to stop or reverse would have been less effectual and more dangerous than to port and maintain her speed. To this conclusion we agree. But it is said that the Rome should have ported or checked or stopped before receiving this second signal. This second exchange of signals most probably occurred when the vessels were about 1,000 feet apart. Capt. Fox, it is true, estimates that they were within 300 or 400 feet of each other, and most of his officers and crew seem to concur with him. Upon the other hand, Capt. Hollingshead, of the Mack, says he gave his second signal when about five ship lengths from place of collision. This would make the boats 3,000 feet apart, and in this estimate he is supported by most of the witnesses from his deck. The circumstances tend to show that neither

estimate is acceptable and that they were in fact somewhere in the neighborhood of 1,000 feet apart, rather more than less. The Mack had then commenced to swing, as could be seen from the Rome; her hull then being in sight, the night being clear and starlighted. The Rome ported long enough before the collision to show effect of her helm, and this was not likely to have been the case if she was within a ship length of the Mack, as they were approaching each other at rate of not less than one mile in four minutes.

The charge of negligence upon the part of the Rome is based upon the statement of her master that from the time of her first exchange of passing signals until the second exchange he could see only the green light, range light, and head light of the Mack; that is, her red or port light remained shut out. This meant that she had not swung, or had not swung far enough, after the passing agreement, to enable the Rome to see that she had. As it was, the event shows that if the Mack had ported a few seconds earlier, or had swung the slightest bit faster, the collision would have been averted. The collision was a mere shave, the port bow of the Mack striking a glancing blow about the second hatch on the port side of the Rome. So it is that if the Mack had been 25 feet further east, or the Rome that much further west, they would have cleared each other. The fault of the Mack in coming over so far to the westerly side of the bend before swinging is clear. Whether she postponed porting too long, or swung sluggishly, being heavy laden and the bottom close under her stern, cannot be said. Before receiving this second signal of one blast, which was, in effect, an assurance that the Mack was porting and was directing her course to her own side of the bend, she had apparently kept a course headed apparently on the light. Her red light continued to be shut out, and the fact that she was swinging was only observed when she was close enough to see her hull. This was simultaneous with her second signal. Fearing, then, from her position, that there was risk of collision, the Rome at once hard a-ported. This was possibly five seconds too late, as the event shows. For the Mack it is said that so long as the Rome could see only her green light it was evident that she was not swinging to starboard and was still heading on her original course, and that as she was seen to persist in that course up to the time of her second signal of one blast that the Rome should have realized that there was risk of collision before she did and either ported or checked until her intention became clear.

That every vessel when approaching another so as to involve risk of collision shall slacken her speed, or stop or reverse, if necessary, is plain elementary law. So if one vessel be approaching another which has disregarded her signals, or whose course and purpose is uncertain she should check her speed or stop or reverse, as the case seems to demand, until her course is ascertained with certainty. The New York, 175 U. S. 206, 20 Sup. Ct. 67, 44 L. Ed. 126; Marsden on Collisions, 434 et seq. But here was a situation in which the Rome, according to the well-known course of navigation at this bend, had a right to assume that the Mack would make her change in course

somewhere between the Bar Point Light and the gas buoy. Thus there was abundant sea room, the channel between these two objects having a width of not less than 2,500 feet. But under the passing agreement it became the duty of the Mack to make this turn upon the easterly or northerly side of the bend, leaving the westerly and southerly side for the Rome to make her own change of course. The Rome was not bound to anticipate that the Mack would not act lawfully and comply with her agreement, and so long as there was apparent reasonable opportunity for her to swing and clear the Rome the latter might assume that she would do so. This is the doctrine as we read and construe the cases of The Free State, 91 U. S. 200, 205, 23 L. Ed. 299; The Servia, 149 U. S. 144, 154, 13 Sup. Ct. 817, 37 L. Ed. 681; The New York, 147 U. S. 72, 13 Sup. Ct. 211, 37 L. Ed. 84; The Victory v. The Plymothian, 168 U. S. 410, 427, 18 Sup. Ct. 149, 42 L. Ed. 519, and the case of The Elphicke, 123 Fed. 405, 407, 59 C. C. A. 286, a case decided by this court, the opinion being by Judge Severens. Neither was the Rome required to consider the possibility that the Mack would be unable to comply with her agreement or that she would, through negligence, persist too long in her original course.

In Marsden on Collisions at Sea (3d Ed.) 351, it is said:

"In estimating risk of collisions, it seems that the possibility of the other ship being unable to comply with the regulations, or of her negligently departing from them, is not, at least under ordinary circumstances, to be taken into consideration."

The Jesmond and Earl of Elgin, L. R. 4, P. C. 1. Under a state of facts somewhat analogous in The Victory and The Plymothian, 168 U. S. 410, 426, 18 Sup. Ct. 156, 42 L. Ed. 519, it was said:

"Each of these vessels was entitled to presume that the other would act lawfully; would keep to her own side; if temporarily crowded out of her course, would return to it as soon as possible; and that she would pursue the customary track of vessels in the channel, regulating her action so as to avoid danger. The Servia, 149 U. S. 144, 13 Sup. Ct. 817, 37 L. Ed. 681; The City of New York, 147 U. S. 72, 13 Sup. Ct. 211, 37 L. Ed. 84; Belden v. Chase, 150 U. S. 674, 14 Sup. Ct. 264, 37 L. Ed. 1218."

Within the meaning of the rule, "risk of collision" is not constituted when by compliance with a passing agreement they can certainly pass in safety and each vessel may be navigated upon this supposition until the intervention of something which should operate as notice to an officer of skill and prudence of the presence of danger. The duty required of the Rome under the passing agreement was to keep upon the westerly side of the channel at the bend. The navigable water was a half mile wide between the light and the buoy above. There was therefore plenty of sea room to the westward of the course of the Rome. This is settled from the fact that the collision occurred at a point only 400 or 500 feet northeast of the light. The speed of the Rome was moderate. Though going with the current, it did not exceed seven and one-half miles.

This case has been argued against the decree of the district judge finding no fault in the Rome as if the mere fact that a collision occurred afforded sufficient evidence that the Rome had failed to do something in time which the situation required her to do. It is true

that if she had ported a few seconds sooner the collision, which was a mere shave, would have been avoided. But it is equally true that if the Mack had ported a few seconds sooner, or her swing after porting had been a little more rapid, the collision would have been escaped. The course the Rome was upon when she did realize the necessity of porting to give the Mack more room was absolutely in accordance with the passing agreement and was such as to keep her well over upon the westerly and southern side of the bend. She was entitled to hold that course and manage her own navigation upon the supposition that the Mack would make the turn without encroaching too far upon the Rome's side of the channel, and until it was apparent that the Mack was not going to do this there was, in a legal sense, no risk of collision, which called upon her to slacken her speed, or stop or reverse or go more to the west. The collision which did occur was the consequence of the sheer negligence of the Mack in the disobedience of the well-known rules of navigation at this bend and of her express passing agreement. When was the Rome chargeable with notice of risk of collision growing out of this disobedience? She realized that there was danger when they had come within 1,000 feet of each other and promptly ported. How long before that ought she to have regarded the Mack as too long adhering to her apparent original course?

Appellant says that there was risk of collision before this porting, and that the failure to check or stop or port at a time antecedent is a fault for which she should be condemned. This direction to check, stop, or reverse when two vessels are proceeding upon a course, which involves risk of collision manifestly does not apply to a situation which is perfectly safe if no departure is made from settled principles of navigation whether imposed by statute or custom. Britt, M. R., in the case of The Beryl, L. R. 9 P. Div. 137, 139, very sensibly says of this requirement:

That "it is an instruction as to the conduct of men, and it cannot be that they are to do that thing merely because it is proved afterwards that there was risk of collision, or if there was risk of collision about to be constituted. It must apply if the circumstances are such that an officer of ordinary skill and care would be bound to come to the conclusion that if the ships continue to approach each other there will be risk of collision."

The object of the rule is to avoid risk of collision, and we are not to be understood that a vessel is under no duty of obeying the rule in respect to vessels meeting end on, so as to involve risk of collision until the risk of collision has actually arisen. What we mean to say is that the rule applies whenever it is or ought to be apparent that there will be risk of collision if nothing is done to prevent it. But under the situation here the rule did not apply until the Mack began to depart from her duty and disregard her obligation. Only when this became or ought to have become apparent would a reasonably prudent navigator be charged with notice of risk of collision. As was said in the case of The Victory and The Plymothian, 168 U. S. 410, 18 Sup. Ct. 149 42 L. Ed. 519, the question as to whether the Rome may not have been slightly in fault may be a close question. "This is often so when subsequent knowledge of what might have prevented disaster tends to qualify the inquiry as to the prior duty to avoid it." But it is not

enough to raise a close question as to whether the Rome may not have been a few seconds slow in realizing that the Mack was not doing what she had every reason for assuming she would do. The fault of the Mack being established beyond cavil she is not entitled to divide damages with the Rome upon criticism of her management except upon clear proof of some fault not made in extremis and reasonable doubts should be resolved in her favor. The Atlantis, 119 Fed. 568, 56 C. C. A. 134; The New York, 147 U. S. 72, 13 Sup. Ct. 211, 37 L. Ed. 84.

This collision occurred in the nighttime. The hull of the Rome was invisible until at the moment the Rome ported. Even then the Mack, by her signal of one blast, gave assurance that she was directing her course to starboard. Before that she was a mere bunch of lights, and it was hard to estimate her distance with any degree of accuracy. There was no room for misunderstanding what she proposed to do. The lights of each were visible to the other, and there was no confusion in signals. The Rome was also incumbered with a tow. It was not until such time as the Rome ought to have discovered that the Mack was coming so near her own course as to probably involve risk of collision that she was under any obligation to apprehend danger and take measures to avoid collision. The Servia, 149 U. S. 144, 153, 13 Sup. Ct. 817, 37 L. Ed. 681. In view of all the facts, and of the denial of a division of damages by a much experienced admiralty judge, we are not satisfied to hold that the Rome was in fault for not anticipating risk of collision before the moment when she took the most reasonable course to avert it.

The case is distinguished from The Elphicke, 123 Fed. 405, 59 C. C. A. 286. The collision involved in that case between the Poe and the Elphicke occurred in broad daylight. The Poe saw that the Elphicke was not doing her duty, and "was out of her proper place and taking measures to right herself"; but she depended upon the Elphicke being able to retrieve her fault, and refused to vary her own course. It was a clear case of apparent danger of collision with time to avoid it. The suggestion that there was some evidence tending to show want of proper lookout has nothing in it. The circumstances indicate that the watchman was at his post. But, whether he was so or not, the master saw and heard all that was to be seen and heard, and the case has been tried out upon the theory that from the admission of the master in respect to the position of the Mack the Rome was at fault in not sooner realizing the misconduct of the Mack.

The decree must be affirmed.