### THE A. G. BROWER.

(District Court, N. D. Ohio, E. D.   January 1, 1913.)

#### No. 2,454.

COLLISION (§ 91*)—STEAM VESSELS MEETING—FAULT.

A collision between the steamship Ellwood, down bound, when turning eastward into Lake Erie at the south end of the Detroit River channel, and the steamship Brower, up bound from Toledo, *held* due solely to the fault of the Brower in keeping too far to the eastward in the part of the channel which belonged to the Ellwood, instead of turning up the channel in the usual and proper course, and as required by the passing agreement of two whistles made when the two vessels were a mile apart.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 187–192; Dec. Dig. § 91.*]

In Admiralty. Suit by the Pittsburgh Steamship Company, owner of the steamship Isaac L. Ellwood, against the steamship A. G. Brower. Decree for libelant.

Hoyt, Dustin & Kelley, of Cleveland, Ohio, for libelant.
Goulder, Holding & Masten, of Cleveland, Ohio, for respondent.

DAY, District Judge. This case arises out of a collision which occurred in Lake Erie a short distance below the Detroit River light, on the evening of August 27, 1907, between the steamship Isaac L. Ellwood and the steamship A. G. Brower. The Ellwood was bound down the lakes, laden with a cargo of iron ore. The Brower was bound up the lakes, laden with coal. Shortly before 8 o'clock in the evening, in the neighborhood of the first gas-buoy above Bar Point lightship, the vessels collided. It is the claim of the Ellwood that, while she was bound down, and in the neighborhood of the first gas-buoy above Bar Point lightship, and was proceeding down about the center of the channel above the Detroit River lighthouse, at her usual speed, and when at the usual and proper place for beginning to make the necessary turn, at a point below the gas-buoy, she started to swing to port, and at the same time she sounded a two-blast signal to a down-bound steamer in the neighborhood of a mile away apparently upon a course up bound from Toledo. This up-bound steamer, which

proved to be the Brower, responded with two blasts; but about this time, or shortly afterwards, as the Ellwood was swinging to port, and the Brower still a considerable distance off to starboard, the Brower again sounded a two-blast signal, which the Ellwood answered with two, still continuing on a swing, under a hardastarboard wheel. As the vessels approached each other, it was discovered by the watch on the Ellwood that the Brower was not making her turn properly, but was heading on to the Ellwood amidships. When this was discovered, the Ellwood's wheel was put hard to port, and, notwithstanding this effort, the Brower's stem and starboard anchor struck the Ellwood on the latter's starboard side, causing the damages complained of.

It is contended on behalf of the Brower that there were several dredges extending out to the southeastward from the Detroit River light; that the Brower saw the lights of the Ellwood as she was making the turn into Lake Erie, and heard the two-blast signal. It was then observed from the Brower that the Ellwood was not swinging in accordance with her signal, and with her own helm hardastarboard, the Brower repeated the two blasts. The Ellwood answered with two, and then, as the Ellwood was not being swung sufficiently, the Brower's, engines were reversed, but the Ellwood came on, and there was a collision at a small angle, and a glancing blow, causing injury to both boats.

It will be noticed from these claims there was no insufficiency of lights and no misunderstanding of signals. The principal complaint of each vessel against the other is that she did not make the turn properly; in other words, that she was occupying the waters of the other vessel.

I think that the location of the point of collision has been definitely ascertained, both from the testimony of all the witnesses, and from the point fixed in the survey which was introduced in testimony. There were five dredges at work to the southward and eastward of the Detroit River light. These dredges were nearly in a straight line, and close to the westerly edge of a new 800-foot channel or cut; these dredges being on the average of 1,000 to 1,200 feet apart. The point of collision was about 1,200 feet east of the line of the dredges.

From the entire record it appears that, if the Brower had taken the ordinary and proper course of a vessel bound from Toledo, she would have been several hundred feet further to the westward than the point of collision. For the boat to go into the waters east of the dredged channel was entirely unnecessary. In making her turn to port, the Brower failed to direct her course to port, according to the signals. She went over into the waters of the Ellwood apparently depending upon the Ellwood to partly anticipate meeting her, and this caused the disaster. The Ellwood in making the turn went several hundred feet further to the eastward than vessels ordinarily went, and, had the Brower made the turn properly, there would have been several hundred feet between the boats in passing under the starboard signal.

It is evident that the Ellwood might have increased the space sev-

·eral hundred feet more, but she was not required to do so, for each vessel was entitled to presume that the other would act lawfully in reference to its navigation. The Victory & The Plymothian, 168 U. S. 426, 18 Sup. Ct. 149, 42 L. Ed. 519.

Mate Bryce, of the Brower, an experienced navigator, holding master's papers, said:

"Q. He would in the ordinary course of navigation, going down there, and getting a two-blast signal from an up-bound vessel, would expect, would he not, the up-bound vessel would pass at least within 600 feet of the Detroit River lightship, would he not? A. Yes, somewhere along about 600 or 500 or 300 feet."

It is not contradicted that the course taken by the Ellwood was northward further from the dredges than is usually taken by vessels at this point in the lake. From Bryce's testimony, it appears that the Brower, near the time of the collision, was far over from the middle line of the dredged channel, into the water of the Ellwood.

The testimony of the witnesses on the dredges does not materially dispute the point of collision. Had the Brower starboarded at the proper time, and swung to port in obedience to the passing signals, it is plain this collision would not have occurred. In any event, she failed to make her turn up the channel, in the usual and proper way. She was not following the proper course, and this caused the collision.

The question is raised as to the sufficiency of the lookout on the Ellwood. I think it appears in the record with clearness that any insufficiency of the lookout could have had nothing to do with the disaster that followed. The captain was navigating the Ellwood, and appears to have understood what was going on at the time of the disaster. There was nothing in the nature of the locality that would give those in charge of the navigation of the Brower to expect that the Ellwood would proceed in any other than the direction in which she did. The Ellwood was navigated in the customary manner. Compliance with the customary usages of navigators at this place was required, and each navigator had to expect that the turn would be made in such a manner as not to interfere with the navigation of the other vessel. Lake Erie Transportation Company v. Gilchrist Transportation Company, 142 Fed. 89, 73 C. C. A. 313; The Victory & The Plymothian, 168 U. S. 410, 426, 18 Sup. Ct. 149, 42 L. Ed. 519.

The navigators of these two vessels knew that each intended to make a turn as part of the usual and customary course attributable to each, and that such navigation would keep them clear of each other if the maneuvers were properly made. The risk of collision was not involved if each vessel did what it was bound to do under the agreement and usages of navigation. The Ellwood was not bound to anticipate that the Brower would not be navigated in the usual manner and comply with the passing agreement. Each steamship was bound to conform to her own customary course and maneuvers and take notice of the customary course and observe the movements of the other, and each had the right to assume that the other would do so. The Servia, 149 U. S. 144, 153, 13 Sup. Ct. 877, 37 L. Ed. 681.

The Ellwood was entitled to hold her course and manage her own navigation on the supposition that the Brower would make her turn without encroaching upon the Ellwood's side of the channel, and, until it was apparent that the Brower was not going to do this, there was in a legal sense no risk of collision which called upon the Ellwood to slack her speed or to change her course over to the other side of the channel. The collision which occurred was a consequence of the negligence or fault of the Brower, in disobedience of the rules of navigation at this point and of her expressed passing agreement. The Ellwood took the most reasonable course to avert the collision, and I cannot see how the Ellwood was in any way at fault.

The record is not entirely clear with reference to the lookout maintained by the Ellwood; but, in any event, the master of the Ellwood saw all that was necessary to be seen, and heard all that was necessary to be heard, in order to properly navigate his boat at this time.

I am therefore of the opinion that the Brower alone was wholly at fault in causing this collision.