### THE SOCONY NO. 5. *

(Circuit Court of Appeals, Second Circuit. October 31, 1922.)

No. 12.

Collision ☞95(2)—Tug held solely at fault.

> Where steamer was proceeding out of New York Harbor, having exchanged passing signals with a tug, with two barges made fast, one on either side, whereby the steamer was to cross the tug's bow, and the tug failed to sufficiently slacken speed, so that the steamer was struck by the barges, bows of which projected forward of the tug's bow, while the tug was attempting to pass to the stearn of the steamer, held, that the tug was solely at fault for the collision.

Appeal from the District Court of the United States for the Southern District of New York.

Libel by the Clyde Steamship Company against the steam tug Socony No. 5, her engines, etc.; the Standard Oil Company of New York, claimant. From a decree for libelant, claimant appeals. Affirmed.

Duncan & Mount, of New York City (O. D. Duncan, Warner Pyne and H. W. Nichols, 3d, all of New York City, of counsel), for appellant.

Burlingham, Veeder, Masten & Fearey, of New York City (Chauncey I. Clark, of New York City, of counsel), for appellee.

Before ROGERS and MANTON, Circuit Judges, and AUGUSTUS N. HAND, District Judge.

MANTON, Circuit Judge. On October 15, 1918, the Pawnee, appellee's steamer, left Pier 44, North River, with a general cargo bound for Philadelphia. The weather was clear, the wind northwest, and the tide flood. She proceeded down about mid-channel, with the master and first officer in the pilot house, a sailor at the wheel, and a lookout stationed forward. She observed the Socony No. 5, appellant's steam tug, about 2,000 feet away and from two to three points on the starboard bow, with two barges made fast, one on each side. This flotilla was proceeding out from the anchorage ground below the Statue of Liberty. The Pawnee blew two blasts to the No. 5, and was immediately answered by her with two. This exchange of signals indicated a passing agreement, and the Pawnee, the burdened vessel, continued on. So did the No. 5, and in attempting to pass to the stern of the Pawnee the bows of her barges were extended forward of the tug's bow, striking the Pawnee a blow on her starboard quarter near the aft port. This occurred about 5:30 p. m. The exchange of signals is conceded, and also that the No. 5 rang for her engine to go at half speed, and continued at half speed until about 100 feet from the Pawnee; then

she stopped her engines and drifted on, and her engines were later reversed, but her headway brought her into collision with the Pawnee. No alarm whistles were sounded.

The appellant contends that the Pawnee starboarded her helm before the collision, thus causing her to swing her stern toward the No. 5. This is denied by the appellee, and her master says that she ported before the collision, in order to swing the Pawnee's stern away from the No. 5. Assent having been given by the No. 5 in answering to the two blast signals, the Pawnee was entitled to proceed as she did. Her captain had the situation well in hand, and when the Pawnee gave the signal, indicating a request to pass, she could have ported and gone under the stern of the No. 5, if the request was denied. The request having been granted, there was nothing in the situation which indicated danger. Both vessels were entirely under control. With the consent of the No. 5, the master of the Pawnee rightfully proceeded down the bay with the understanding that the No. 5 would reduce her speed. But she continued under half speed for about 100 feet, and then stopped her engines and drifted under her headway for about 100 feet and reversed her engines, but did all this too late to avoid the collision. This fault in navigation brought about the collision. These circumstances render the No. 5 solely at fault for the collision. The No. 5, being a privileged vessel having the right of way, surrendered that privilege to the Pawnee when, by the exchange of signals, it arranged for the Pawnee to cross her bow. This was a waiver of articles 20, 21, and 23 of the Inland Rules (30 Stat. 96 [Comp. St. §§ 7894, 7895, 7897]). The Albatross (D. C.) 184 Fed. 363. It thus became the duty of the No. 5 to direct her course astern of the Pawnee. Further it appears that the Pawnee could not go to the eastward because of a government destroyer, which was following her down under her port quarter about 100 feet away.

But it is contended by the appellant that if the No. 5 had stopped her engines and reversed, as she was directly below the steamships anchored on the anchorage grounds, there was danger of the flood tide setting down upon her, but the record does not support this contention. The No. 5 cleared the anchored steamers before she came near the Pawnee. The place of collision was about 1,200 feet west of the anchorage grounds. The situation is different than that in The Admiral (D. C.) 39 Fed. 574, where the two whistles which indicate a request to proceed by the burdened vessel were not answered, and where the burdened vessel kept on without change of course or speed, and The Thielbek, 241 Fed. 209, 154 C. C. A. 129, where, having "requested a starboard to starboard passage which was assented to by the tug, the Fagelund, within a few seconds, as has been said, reversed her engines, swung to her own starboard directly across the course which she had just assigned to the tug in tow," and where it was declared "in our opinion that was the grossest sort of negligence." The Hokendaqua, 251 Fed. 562, 163 C. C. A. 556; The Lexington (C. C. A.) 275 Fed. 279.

The case is different than in such cases where the two whistle proposals were impracticable and dangerous, or where assent was not giv-

en in time, as in The Newburgh (C. C. A.) 273 Fed. 436. There was no tide to embarrass the No. 5, nor any sound reason why she did not stop sooner and take the precautions which careful and prudent navigation dictated, so as to allow the Pawnee to pass down the main ship channel as agreed upon. These circumstances require us to hold that the No. 5 was solely at fault.

The decree below is affirmed.