## THE HAVRE MARU.

### DAMPSKIBS AKTIESELSKABET PHŒNIX et al. v. OSAKA SHOSEN KABUSHIKI KAISHA et al. and cross suit.

(District Court, E. D. New York. September 3, 1926.)

Nos. A. 6989, 6990.

1. **Collision** ⬅➡91—Vessel held at fault, in failing to change course in accordance with signals, and liable for collision.

Vessel *held* at fault, in failing to change course after signals for port to port passing, and liable for collision.

2. **Collision** ⬅➡90—Colliding vessels held not to have been proceeding on crossing courses.

Vessels colliding while proceeding to mooring buoys back of breakwater in harbor *held* not to have been proceeding on crossing courses.

3. **Collision** ⬅➡2—Collision of Norwegian and Japanese steamships in harbor of Kobe, Japan, held governed by International Rules.

Collision of Norwegian and Japanese steamships inside of breakwater in harbor of Kobe, Japan, *held* governed by International Rules and not Inland Pilot Rules.

4. **Collision** ⬅➡108—Vessel held not liable for mistake in judgment of its pilot, acting in extremis.

In libel for collision, vessel *held* not liable for mistake in judgment of its pilot, acting in an emergency created by wrongful navigation of the other vessel.

**5. Admiralty ⬤=66—Motion for leave to amend is addressed to court's discretion.**

Motion for leave to amend libel is addressed to discretion of court.

In Admiralty. Libel by the Dampskibs Aktieselskabet Phœnix and another, owners of the steamship Hallgrim, against the steamship Havre Maru and Osaka Shosen Kabushiki Kaisha, its claimant, in which certain cargo owners intervened, and claimants filed a cross-libel. Decree for libelant and interveners in main suit, and cross-libel dismissed.

Haight, Smith, Griffin & Deming, of New York City (John W. Griffin, of New York City, of counsel), for libelants.

Bigham, Englar & Jones, of New York City, for intervening petitioners.

Hunt, Hill & Betts, of New York City (George C. Sprague, of New York City, of counsel), for claimant and respondent.

CAMPBELL, District Judge. These are cross suits for damages caused by a collision which occurred in the Harbor of Kobe, Japan, between the Norwegian steamship Hallgrim and the Japanese steamship Havre Maru.

An intervening petition was filed by the owners of some of the lumber cargo alleged to have been damaged in the collision.

On slightly conflicting testimony, I find the facts to be as follows:

The inner harbor of Kobe is protected by a breakwater known as the east breakwater. This breakwater runs in a curve to north and east and has a lighthouse at each end. Inside of the breakwater there is open water, about 1,200 feet in width, between the breakwater and a series of mooring buoys, placed at various points in the anchorage grounds to the west of the open water, which is referred to by the Hallgrim's advocate as the channel.

Early in the morning of July 16, 1924, both the steamship Hallgrim and the steamship Havre Maru arrived at Kobe, but, because of the gale, were prevented from entering inside the breakwater, and anchored outside; the Hallgrim at a point south of the southern breakwater, and the Havre Maru some distance east of the "breakwater in course of construction."

Both vessels were bound for mooring buoys, the Hallgrim for buoy No. 18, which is north of the northern end of the east breakwater, and the Havre Maru for buoy No. 9, which is about southwest of the lighthouse at the southern end of the east breakwater.

The Hallgrim was a steel cargo steamship, 420 feet long, 54 feet beam, 34 feet 3 inches in depth, 6,630 tons gross, built in 1921. She was fully loaded, including a 10-foot deck load of lumber, and her draft at the time of the collision was 24 feet forward and 25 feet aft.

The Havre Maru was a steel cargo steamship, about 407 feet long, 51 feet beam, 32½ feet in depth, 5,652 tons gross, built in 1920. She was partly loaded with 1,500 tons of general merchandise and 680 tons of bean oil aboard, and her draft at the time of the collision was 11 feet 6 inches forward and 17 feet 6 inches aft.

There was a difference in the clocks of the two vessels; the clock of the Havre Maru being five minutes faster than the clock of the Hallgrim.

The weather was cloudy but the visibility was clear. It was the middle of the flood tide, which was not strong, and was running northerly along the breakwater, and the wind, which had been blowing a strong gale from the east earlier in the day, had shifted to the southeast and dropped to a very light breeze.

The Hallgrim, with a Japanese pilot in charge, weighed her anchor at 4:22 p. m. and left her anchorage, entered the inner harbor, passing the south end of the east breakwater, and directed her course up the open water between the breakwater and the mooring buoys towards her destination, running parallel with the eastern breakwater, and at a distance of about 500 to 600 feet inshore from it.

The Havre Maru weighed anchor at 4:29 p. m. by her time, which, allowing for the difference of 5 minutes in time between the Havre Maru and the Hallgrim, made it about 2 minutes after the Hallgrim had weighed anchor. The port anchor of the Havre Maru was lashed and its chain unshackled so that the chain could be used for mooring at No. 9 buoy; it being customary so to do in Kobe Harbor. The starboard anchor was in readiness to let go in case of necessity.

For some unexplained reason, the Havre Maru did not enter at the southern end of the east breakwater, just inside of which entrance buoy No. 9 is located, but went up outside and around the northern end of the breakwater, and undertook to pass the Hallgrim in the open water between the breakwater and the mooring buoys.

As the vessels were approaching, at first the Havre Maru was on the Hallgrim's starboard bow, and both were on steady courses. The Havre Maru began to swing around the northern end of the breakwater, and, at 4:46 p. m. the Havre Maru time, blew a signal of two whistles.

The Hallgrim's engines had been stopped shortly before this, when she was off the middle of the breakwater, and she was running out her headway, being then 500 to 600 feet off the breakwater and a little to the west of the middle thereof. She replied with a signal of two whistles, starboarded her helm, and began to swing over to the left side of the open water between the breakwater and the mooring buoys.

The Havre Maru twice repeated her signal of two whistles, at 4:48 p. m. and 4:50 p. m., and the Hallgrim each time answered with two.

The Hallgrim's helm was put hard astarboard on the second signal, and her engines were put slow ahead to facilitate her swing, and she continued until she swung so far over to port that buoy No. 17 was bearing a trifle on her starboard bow.

The Annam, a vessel of about 400 feet in length, was moored to buoy No. 17 and tailing to the northwest; thus being broadside to the Hallgrim.

As the Hallgrim approached, she straightened up enough to pass just clear of the buoy in order to avoid collision with the Annam, but did not make a sudden turn to starboard, and in so doing left about 1,000 feet of the 1,150 feet of the clear water, between the breakwater and mooring buoy open for the Havre Maru's navigation.

The Havre Maru did nothing more than put her helm "easy" starboard, and took the whole width of the clear water for her swing. She did not put her helm hard over until just before the vessels came together, and did not reverse her engines until too late to check her way.

The Hallgrim could not go further west without running into the Annam, and, as it was, she came so close that the Annam, fearing that the Hallgrim was going to run into her, prepared to slip her moorings and ordered the engineers to stand by.

The Havre Maru, with her engines reversed too late to do any substantial good, continued ahead, dropping her starboard anchor when within half a length of the Hallgrim, and at 4:47 p. m. by the Hallgrim's time, struck the Hallgrim on the starboard side forward of amidships, at No. 3 hatch,

tearing a hole about four feet wide from far below the water line up to the Hallgrim's deck.

The Hallgrim was thrown over to port by the shock of the Havre Maru's momentum, and then took a correspondingly heavy list back to starboard. The water poured in through the hole, and her officers beached her without delay at the nearest available point, preventing her from sinking in the open water. The ship and cargo sustained damage. The Havre Maru suffered some damage to her stem.

The collision was on a line between buoy No. 17 and the north end of the breakwater and about 50 feet off the buoy.

That, when the vessels first sighted each other, the Hallgrim had the Havre Maru on her starboard bow is conceded, and from this fact the respondents contend that this was a case of crossing courses.

With this contention I am not in accord, because the open water between the breakwater and the buoys in which the Hallgrim was proceeding curved the same as a river might bend, and it seems to me that the fact that the Havre Maru was on the Hallgrim's starboard bow when the vessels first sighted each other does not make it a case of crossing courses, any more than it would if they were following the bends of a river.

[1, 2] The Hallgrim was bound for buoy No. 18 at the upper end of the open water between the breakwater and the mooring buoys, and the Havre Maru was bound for buoy No. 9 at the lower end. They were to pass in that open water, one going up the other coming down, and it was not a case of crossing courses. The Victory and The Plymothian, 168 U. S. 418, 18 S. Ct. 149, 42 L. Ed. 519; Lake Erie Transp. Co. v. Gilchrist Transp. Co. (C. C. A.) 142 F. 89; The L. C. Waldo (C. C. A.) 100 F. 502.

The Hallgrim was at that time on her starboard side of the open water, and, if no signals had been given by the Havre Maru, and she had rounded the turn and come down on her starboard side of the open water, the vessels would have passed port to port, and the Hallgrim passed under the Havre Maru's stern to her buoy.

If, however, I should be in error, and this was a case of crossing courses, then it seems clear to me that the Havre Maru did not obey the rules relating to that situation. In the first place, she did not hold her course, because her course was not a curve at the time the vessels sighted each other, as respondents contend, but a steady course from

the time she passed buoy No. 21 until she had the breakwater nearly abeam.

Thus from the time when the vessels began to navigate with reference to each other, and up to the time when the first whistle signal was blown, the Havre Maru was on a straight course nearly northwest, and when she changed that course libelant claims that the starboard hand rule ceased to apply.

This I think is not exactly the effect of that change, but what the Havre Maru was bound to do, if the starboard hand rule applied, was to keep her course in such a manner as good seamanship and common sense would dictate under the surrounding circumstances, and so make her swing as to avoid that part of the open water in which she, by her signal, had requested the Hallgrim to take her course, and this she did not do.

In the second place, the Havre Maru did not hold her speed, because from the time she passed buoy No. 21 until she passed the breakwater (if we take her master's figures, which I think are too low), she was going at three knots, and at that time she reduced her speed to one knot, whereas libelant claims she should have been holding her speed unchanged, if she intended to claim that the starboard hand rule applied.

This contention is in the main true, but an exception might be made if such change in speed was in harmony with previous changes while on the general course, or for a reason connected with her navigation which was known at the commencement of the maneuver by the other ship; but neither of these conditions existed, and the change in speed was unjustified.

If this was a case of crossing courses, the Havre Maru was the privileged vessel, and she initiated a new maneuver by blowing two whistles. The Newburgh (C. C. A.) 273 F. 436; The Morristown (C. C. A.) 278 F. 714; The Socony No. 5 (C. C. A.) 285 F. 154.

None of the cases cited by the respondents (The Roanoke, 11 Asp. Mar. Cas. 253, 1908, p. 231; The Velocity, L. R., 3 P. C. 44, 1869; The Esk, L. R., 3 P. C. 436, 1870; The Echo, P. C. 1917, 132; The Propeller John Taylor, 6 Ben. 227, Fed. Cas. No. 7,429; and the two unreported cases in the District Court, Southern District of New York, The Napoli, June 4, 1920, Lehigh Valley Transportation Co. v. Central R. R. of N. J., June 7, 1920, and the case of Liverpool, Brazil & River Plate Steam Nav. Co., Limited, v. U. S. A., noted in 12 F.[2d] 128, 1926 A. M. C. page 320, but not reported

in full), in my opinion apply, and it is to be noted that in the last-cited case, on which respondents specially rely, the Romney, which was the privileged vessel, relied on her privilege and signaled accordingly, and did not institute a new maneuver, as did the Havre Maru in the case at bar.

Surely the Hallgrim, in her then position, knowing the Havre Maru was going to swing down the open water, would not, nor would any one in a like position, on hearing that signal, have interpreted it in any other way than that the Havre Maru intended to direct her course to port and pass the Hallgrim starboard to starboard, instead of holding to her privilege and crossing the course of the Hallgrim and going down on the westerly side of the channel, passing the Hallgrim port to port.

That the Hallgrim should go to port and the westerly side of the open water is exactly what the Havre Maru desired and intended she should do, because it was testified by witnesses called on behalf of the Havre Maru that the signals (two whistles) were reiterated by the Havre Maru because they did not think the Hallgrim was swinging to port fast enough.

While, if this was a case of crossing courses, it was the duty of the Hallgrim to keep out of the way of the Havre Maru, that does not mean that the Hallgrim was to keep out of the way of the Havre Maru wherever she might please to go, regardless of the signals she had given, but that the Hallgrim, by executing the maneuver called for by the signals of the Havre Maru, should keep out of the way of the Havre Maru holding her course and speed, as the same has been defined.

[3] In the case at bar, the navigation of the vessels was governed by the International Rules, not the Inland Pilot Rules, and therefore there was no provision for passing signals or for the sounding of alarms, but the effect of the sounding and reiteration, while swinging, of the two whistle signals, by the Havre Maru, was to indicate a change of course which would cause her to swing around to port, and, as she was bound for buoy No. 9, it would of necessity carry her past the Hallgrim starboard to starboard.

So much of the International Rules as is material in the case at bar reads as follows:

"Art. 19. When two steam vessels are crossing, so as to involve risk of collision, the vessel which has the other on her own starboard side, shall keep out of the way of the other."

"Art. 21. Where, by any of these rules, one of two vessels is to keep out of the way the other shall keep her course and speed.

"Note. When in consequence of thick weather or other causes, such vessel finds herself so close that collision cannot be avoided by the action of the giving-way vessel alone, she also shall take such action as will best aid to avert collision."

"Art. 22. Every vessel which is directed by these rules to keep out of the way of another vessel shall, if the circumstances of the case admit, avoid crossing ahead of the other."

"Art. 23. Every steam vessel which is directed by these rules to keep out of the way of another vessel shall, on approaching her, if necessary, slacken her speed or stop or reverse."

"Art. 28. The words 'short blast' used in this article shall mean a blast of about one second's duration.

"When vessels are in sight of one another, a steam vessel under way, in taking any course authorized or required by these rules, shall indicate that course by the following signals on her whistle or siren, namely:

"One short blast to mean, 'I am directing my course to starboard.'

"Two short blasts to mean, 'I am directing my course to port.'

"Three short blasts to mean, 'My engines are going at full speed astern.'"

The following are local rules applicable to the Harbor of Kobe, prescribed by Imperial Ordinance of Japan:

"Sec. XI. Steamers under way within the harbor limits shall proceed at a moderate speed, and sailing vessels, under easy sail, or in tow."

"Sec. XIII. Vessels of all descriptions when rounding the end of wharf, pier, or vessel at anchor, shall keep close in to it if it is on the starboard side, and give it a wide berth if on the port side."

In La Boyteaux's Rules of the Road, pp. 178, 179, immediately adjoining the passages from the International Rules hereinbefore quoted, it is said:

"The International Rules contain only three whistle signals for vessels in sight of each other, viz., two signals denoting changes of course, and one denoting 'My engines are going at full speed astern.' One short blast indicates, 'I am directing my course to starboard.' It does not necessarily mean, as do the Inland Rules, a port to port passing. When, however, steamers are meeting on opposite courses a change of course to starboard is usually for a port to port passing. This, however, is merely an incident of the maneuver. The signal indicates only the change of course to starboard.

"The International Rules do not permit any whistle signal by the holding-on vessel to indicate her intention to hold her course and speed. The only sound signal provided for such vessel is the detoning signal (under article 12) to attract attention.

"All the signals provided by the International Rules indicate either a change of course, or that the engines are working at full speed astern. The holding-on vessel being required (under article 21) to hold her course and speed, it necessarily follows that she cannot use a signal indicating a maneuver not permitted under the rules.

Clearly what the Havre Maru intended, and what the Hallgrim properly understood, was that the Hallgrim should go to port and allow the Havre Maru to swing to the Havre Maru's port and pass down on the Havre Maru's port side of the open water between the breakwater and mooring buoys, and the two vessels thus to pass starboard to starboard. All that prevented the accomplishment of this maneuver was the failure of the Havre Maru to put her helm hard astarboard and thus shorten her swing, instead of swinging on an easy helm, taking up the whole width of the open water between the breakwater and the mooring buoys, and bringing herself into exactly the position she, by her signals, had requested the Hallgrim to take.

The excuse offered by the Havre Maru for making such a wide swing is the Local Rules, § XIII, hereinbefore quoted, with reference to vessels rounding the end of a wharf, pier, or vessel at anchor on their port side.

The construction of this rule as to its application in the case of breakwaters is seriously disputed by the experts on Japanese law, called on behalf of the two vessels, and I am not convinced that it applied in the case at bar. In any event, the opinion of the Marine Court, discussed by the Havre Maru's witnesses, is not res adjudicata, nor do I consider it as an authority on the construction of the rule, as it was not given by lawyers, but by navigators.

Even if the rule did apply, however, it did not require the Havre Maru to take the whole width of the open water between the breakwater and the mooring buoys for her swing, and in so doing force the Hallgrim into a position where competent seamen on

the Annam were so fearful of her coming into contact with her that they made preparations to slip her mooring cable, when, if the Havre Maru had swung even 800 feet off the end of the breakwater, she would have cleared the Hallgrim by over 200 feet.

The purpose of the rule is obvious. It is to prevent collision with a vessel rounding the object in the opposite direction, which may be hidden from view by the pier, wharf, or vessel at anchor. In the case at bar, no such obstruction existed, as a breakwater is low, and in this instance there was no vessel on the breakwater side of the open water to interfere with the Havre Maru's navigation, she having seen the Hallgrim and signaled her when she was inside and about 500 or 600 feet off the breakwater, at about the middle thereof; therefore it seems to me that the local rule furnished no excuse for the Havre Maru's coming over at least 1,000 feet from the breakwater in making her swing.

The hard astarboard order was first given on the Havre Maru just before the collision. Prior to that time her helm had been to starboard, and it was due entirely to the fact that she made the unreasonably wide swing that the collision occurred.

The only explanation I have been able to find for the action of the Havre Maru is that given by her master, when in answer to the question, "Please explain why, after blowing signals of two whistles indicating that you were directing your course to port, you allowed your vessel to reach the place of collision, instead of turning her to port and passing down parallel with the breakwater?" he said, "Because I thought at the time that neither vessel was in a dangerous situation."

Regardless of any dispute as to when the Havre Maru sounded the three whistle signal or dropped her anchor, the fact is that she did not have sternway, as the witnesses called on her behalf claim, but she came into contact with the Hallgrim with some speed.

The testimony of Mr. Wells, called as an expert on behalf of the Havre Maru, is not convincing, as I regard it as being based on insufficient data.

If, as claimed on behalf of the Havre Maru, the Hallgrim made a sudden turn to starboard just before the collision, it would have been impossible for the Hallgrim to have impaled herself on the alleged rapidly receding Havre Maru, one-fourth of the Hallgrim's length from her stem, as was claimed by witnesses called on behalf of the Havre Maru, as it would have been around that point as an axis that the Hallgrim was swinging. Knight, Seamanship (7th Ed.) 307.

Respondents contend that The Victory and Plymothian, supra, Lake Erie Transp. Co. v. Gilchrist Transp. Co., supra, L. C. Waldo, supra, Newburgh, supra, Morristown, supra, and Socony No. 5, supra, are not to be considered as authority in the case at bar, because they arose under the Inland Rules and not the International Rules; but that contention seems to me to be erroneous, because, so far as material, both rules are precisely the same.

Article 19 of the Inland Rules is word for word the same as article 19 of the International Rules, supra.

Article 21 of the Inland Rules is word for word the same as article 21 of the International Rules, supra, save that the International Rules has in addition a note merely declaratory of what the Inland Rules also prescribe, to the effect that, in case of need, the holding-on vessel shall also take such action as may best avoid collision.

Article 22 of the Inland Rules is word for word the same as article 22 of the International Rules, supra.

Article 23 of the Inland Rules is word for word the same as article 23 of the International Rules, supra.

Article 27 of the Inland Rules reads as follows: "Art. 27. In obeying and construing these rules due regard shall be had to all dangers of navigation and collision, and to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger"— and is the same word for word as article 27 of the International Rules.

Article 29 of the Inland Rules reads as follows: "Art. 29. Nothing in these rules shall exonerate any vessel, or the owner or master or crew thereof, from the consequences of any neglect to carry lights or signals, or of any neglect to keep a proper lookout, or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case"—and is the same word for word as article 29 of the International Rules.

The specific provision of the International Rules, that whistle signals mean, "I am directing my course to" starboard or port, as the case may be, are not found in the Inland Rules, but I am unable to see

where that affects the rule laid down in The Newburgh and The Socony No. 5 Cases, supra, even if this be a case of crossing courses.

Neither the Hallgrim nor the Havre Maru were making much speed at the time of the collision, but the Hallgrim was making less speed than the Havre Maru, and the Hallgrim's engines were stopped just before the collision.

The contention is made by the advocate for the respondents that the Hallgrim should have gone to the west of the mooring buoys, but that contention is not sustained, first, because of the fact that it was practically impossible without the aid of a tug, unless it had been attempted when the first two-blast signal was given; and, second, because this case should be decided on the basis of what was expected of the Hallgrim by the Havre Maru at the time, and not on the basis of the possibility of what would have happened if something entirely unexpected had been done by the Hallgrim.

The master of the Havre Maru says he did not expect the Hallgrim to go west of the mooring buoys, and therefore must have navigated with that in view, and it would seem that a width of 900 feet of the 1,150 feet of open water would have been more than sufficient in which to make the swing of the Havre Maru which would have left about 100 feet of clear water between the vessels.

The respondents also contend that the Hallgrim did not go to port soon enough, but that contention seems to be devoid of merit, because, whether slow in swinging to port or not, she did not thereby interfere with the Havre Maru's navigating as she had signaled, because when the first two-blast signal was given the Hallgrim was 500 or 600 feet to port of the breakwater, and at the time of the collision the Hallgrim was so far to port as to be only about 50 feet off buoy No. 17.

It is also contended by the Havre Maru that the Hallgrim should have reversed, and I do not overlook the fact that the courts have strictly held vessels to account for their failure to reverse in time, but the surrounding circumstances cannot be overlooked, and in my opinion the navigator had to decide on the instant, and that under the circumstances the Hallgrim should not have reversed; and I believe that my opinion is supported by the testimony of Capt. Pilcher, the expert called on behalf of the Havre Maru.

The Havre Maru had signaled that she was going to swing to port, and she was actually swinging to port. The signal that she was backing came just before the collision, and at the same time she, for the first time, put her helm hard astarboard and naturally continued to go to port as she normally would for some time after her engine had been reversed. Knight, Seamanship (7th Ed.) 318. She was then heading diagonally toward the Hallgrim's starboard side, and if she continued to swing to port might go clear.

Had the Hallgrim reversed or dropped anchors, she would have stopped directly in the Havre Maru's probable path. Had the Hallgrim reversed, she would have swung her bow to starboard and nearer the Havre Maru. Only by keeping on could the Hallgrim give the Havre Maru a chance to clear the Hallgrim's starboard quarter, and this, it seems to me, might have been accomplished, or at least the point of contact on the Hallgrim would have been further aft, and the blow at a more obtuse angle, which would have caused much less damage, had it not been for the dropping of her anchor by the Havre Maru, which pulled her bow to starboard as she had been heading more to port at the time she gave the backing signal than she was at the time of the collision.

[4] To keep going was the pilot's best judgment, which had to be formed on the instant, and in my opinion it was good judgment (Lake Erie Transp. Co. v. Gilchrist Transp. Co., supra at page 93); but, good or bad, he acted as to him seemed best in extremis, the wrongful navigation of the Havre Maru having alone created the emergency, and the Havre Maru should not be relieved, even in part, if the pilot of the Hallgrim committed a mistake in going on (The Lafayette [C. C. A.] 269 F. 917 at page 925; The Carroll, 8 Wall. 302, 306, 19 L. Ed. 392; The Stadacona [C. C. A.] 242 F. 624).

The claim of the Havre Maru that the Hallgrim at the last moment swung to starboard is not sustained by the evidence. The only thing approaching a swing to starboard was a straightening up to escape running into the Annam, which the Hallgrim had a perfect right to do (Lake Erie Transp. Co. v. Gilchrist Transp. Co., supra), and the fact that it was necessary for her to straighten up for that purpose proves that her position was over on the extreme westerly side of the open water between the breakwater and the mooring buoys, and not well out in

the open water as contended by the Havre Maru.

The testimony of the master of the Havre Maru as to the navigation of the Hallgrim from the time of the first signal to the time of the collision is, in view of all the evidence, especially that of the disinterested witnesses on other ships, clearly erroneous.

The Hallgrim was where the Havre Maru by her signals had requested and expected her to be, and it was impossible for the Hallgrim to go further to the west, whereas the Havre Maru had substantially the whole width of the open water between the breakwater and the mooring buoys in which to navigate; and she not only put herself, contrary to her signals, in a position which made escape for the Hallgrim impossible, but carried on with high speed up to the time when by stopping and reversing her engines the collision could not be avoided.

This was a gross and inexcusable fault on the part of the Havre Maru, and the court should not be astute to find fault on the part of the Hallgrim, unless it be shown that she was clearly guilty of serious contributing fault, and this I cannot find on the evidence. The City of New York, 147 U. S. 72 at page 85, 13 S. Ct. 211, 37 L. Ed. 84; The Victory and The Plymothian, supra at page 423; The Umbria, 166 U. S. 404, 17 S. Ct. 610, 41 L. Ed. 1053; The Oregon, 158 U. S. 186, 15 S. Ct. 804, 39 L. Ed. 943.

[5] The motion for leave to amend, made on behalf of the Havre Maru on the trial, is addressed to the discretion of the court. It seems to me to have been made on sufficient notice, and, under the liberal rules of pleading in admiralty, should be granted; but, inasmuch as I find the Havre Maru entirely to blame and the Hallgrim to be without fault, it does not seem necessary to consider the weight of the evidence offered to prove the allegations of the amendment or to give it further consideration, as the alleged International Convention, under this decision, has no bearing on the question of damages in the case at bar.

A decree may be entered in favor of the libelants, Dampskibs Aktieselskabet Phœnix and Aktieselskabet Rederiet Odfjell, owners of the Hallgrim, and of the intervening petitioners, against the respondent and claimant, with costs and the usual order of reference; and a decree may be entered in favor of the respondents and claimants, the steamship Hallgrim and Dampskibs Aktieselskabet Phœnix et al., in the cross-libel, dismissing it with costs.