## THE ALBATROSS.

### (District Court, S. D. New York. August 3, 1910.)

1. COLLISION (§ 95*)—STEAMSHIP AND TOW—PASSING AGREEMENT—ERROR IN STEERING.

   A collision in lower New York Bay at the lower junction of the Swash Channel with the Main Channel between a steamship and a barge in tow, both passing out, *held* due solely to the fault of the steamship, in that, after assenting by signal to the passing of the tug and tow across her bows, the wheelsman, instead of starboarding the helm as directed by the pilot, ported it, turning the vessel toward the tow and making it impossible for her to recover and pass under its stern.

   [Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 200–202; Dec. Dig. § 95.*

   Collisions with or between towing vessels and vessels in tow, see note to The John Englis, 100 C. C. A. 581.]

2. COLLISION (§ 11*)—CROSSING STEAM VESSELS—WAIVER OF PRIVILEGE.

   A crossing vessel privileged under the starboard hand rule (Inland Navigation Rules, Act June 7, 1897, c. 4, art. 19, 30 Stat. 101 [U. S. Comp. St. 1901, p. 2883]) waives her privilege by assenting to the crossing of the other vessel across her bows.

   [Ed. Note.—For other cases, see Collision, Dec. Dig. § 11.*]

In Admiralty. Suit by the P. Dougherty Company, as owner of the barge Norfolk, against the Palace Shipping Company, Limited, as owner of the steamer Franklyn; the steamtug Albatross, impleaded. Decree against respondent Palace Shipping Company.

James J. Macklin, for libelant and The Albatross.
Convers & Kirlin, for respondent.

HAZEL, District Judge. This action in personam was brought by the P. Dougherty Company as owner of the barge Norfolk to recover damages amounting to $6,000, alleged to have been sustained through a collision in the Lower Bay of New York with the British steamer Franklyn. An answer was interposed by the claimant, Palace Shipping Company, Ltd., owner of the Franklyn, denying liability, and a petition was filed to bring in the steamtug Albatross. The material facts are as follows:

The Franklyn is 400 feet long, 52 feet beam, drawing 26 feet of water, and at the time of the collision was heavily laden with case oil. She was bound on a voyage to Tacu Bar, and in going out to sea came into collision with the barge Norfolk at the lower junction of the Swash Channel with the Main Channel, or about 700 feet east Xs. of the Junction Buoy No. 2½. At the time of the collision, the steamtug Albatross, which was 140 feet long, 26 feet beam, and drawing 15 feet of water, and which was owned by libelant, had in tow the three-masted barges Pocomoke and Norfolk, both light, bound for Norfolk, Va., and navigating at the rate of seven miles an hour. The tide was ebb, running southeasterly at the rate per hour of about 3½ knots. There was a strong wind blowing from the

northwest. When the vessels sighted each other, both were headed toward the junction of the channels; the steamtug and tow then being near Romer Shoal Buoy, while the steamer had just rounded the Southwest Spit. The tug blew two short blasts of her whistle when about ½ to ¾ miles from the steamer, which was not answered by the steamer, as she was clearing a wreck in the channel. After a short delay the steamer replied to a second signal of two blasts blown by the tug. She consented to the proposal that the tug and tow cross her bows. The Franklyn was in charge of local pilot McLaughlin. The master was on the bridge with the pilot, and also the third officer acting as lookout, and the wheelsman was in the pilot-house. The steamer was making about 8 or 8½ knots per hour with the tide. Immediately after clearing the wreck in the channel and blowing the answering signal, the pilot directed the wheelsman to starboard the helm of the steamer. He substantially testified that the steamer swung a little to the southward or to the right, instead of to the left or north, and he thereupon ordered the engine slowed and the wheel put hard astarboard. Following the last-mentioned order, he turned and looked at the wheelsman and observed that he rolled the wheel ½ to ¾ of a turn to starboard, which caused the vessel to sheer to the right and toward the tow, which was then 1,000 or 1,200 feet distant on her port bow.

The testimony of the pilot was to the effect that the wheelsman failed to promptly obey the starboard order, but, on the contrary, turned the wheel in the wrong direction, necessitating a hard astarboard order, which he likewise at the start improperly executed, and, although he quickly turned the wheel to port, it was too late to recover from the swing of her bow to starboard. In the sworn judgment of the pilot, if his order to the wheelsman to starboard had been properly obeyed, the vessel would have swung to the northward and to the stern of the Norfolk, as agreed, and clearing her by about 150 feet. The speed of the steamer was reduced to three knots as soon as the situation became threatening, and quick successive orders to "stop," "half astern," and "full speed astern" were given and obeyed. The testimony of the pilot McLaughlin is sharply contradicted by the master and third officer of the Franklyn; but the wheelsman gave no testimony. They state not only that the orders to starboard and hard astarboard were promptly and rightly executed by the wheelsman, but that the starboard order was followed by an order to steady, which clearly indicated to them a satisfactory headway. I am not satisfied, however, that the master and second officer noticed the headway of the steamer.

Danger of collision was imminent soon after the starboard and hard astarboard orders were given. The Albatross was proceeding in her course on the starboard bow of the steamer and the Norfolk on her port bow. The steamer reversed her engines quickly and cast her starboard anchor to arrest her headway and avoid collision; but the stern of the Franklyn, nevertheless, struck the Norfolk about 40 feet forward of her stern. Libelant claims that dropping the starboard anchor caused the Franklyn, which was then 150 to 200 feet distant

from the Norfolk, to swing to the right, and that the anchor chain was still paying out when the impact with the Norfolk occurred. Respondent's witnesses testified to the contrary. Their claim is that the chain was paid out 60 fathoms, and the headway of the steamer actually arrested before the collision, and, furthermore, that the hawser of the Norfolk was cut by one of her crew causing her to swing over across the channel and into the bow of the Franklyn. The witnesses Hickman, master of the steamtug, Harmon, master of the Pocomoke, and Tyne, master of the Norfolk, testified that the hawser was not cut or let go prior to the collision, but that it was let adrift after the collision and when by force of the impact the Norfolk swung around alongside the steamer.

The specific fault relied upon by the libelant is that the wheel of the Franklyn was wrongly turned, causing the vessel to head towards the Norfolk, thereby making it impossible for the vessel to comply with the agreement to pass under her stern. A fair preponderance of the evidence, in my estimation, establishes such fault. The wind and tide was not such as to appreciably interfere with her navigation, and her failure to promptly respond to the orders of the pilot was the decisive factor which caused her to swerve away from her true course and into the Norfolk.

The version of the pilot attributing the blame to the wheelsman is not above criticism, and it has been carefully scrutinized, together with his earlier statement explaining the occurrence; but the circumstances surrounding the situation of the vessels, their proximity when they became factors in each other's navigation, the testimony of libelant's witnesses that the steamer headed for the barges at a time when she should have been headed towards the stern of the Norfolk, certainly are corroborative of the claim that her course was deviated to the starboard side of the ship. Whether her course was deflected at the first order by the mistake of the man at the wheel or by the action of the tide is problematical; but the mistake when the hard astarboard order was given doubtless sufficiently turned the headway to embarrass her in her movements.

Respondent, disclaiming liability, asserts that the steamtug was in fault: First, for remaining on the westerly side of the channel after blowing the signal; second, for crossing the bow of the steamer; and, third, that the vessels were approaching each other on crossing courses, and that the tug violated the starboard hand rule. It is not thought that the starboard hand rule applied in the situation. The Franklyn, though not in fact overtaking the steamtug, was nearly on a parallel course as she approached the barge, and her position became analogous to that of an overtaking vessel. She was bound to keep out of the way and adopt all precaution to avoid collision, and this she failed to do.

The immediate cause of the collision was the negligent navigation of the steamer in swinging to starboard when she should have swung to port. It is true she was the privileged vessel having the right of way, but she surrendered this privilege to the steamtug and arranged with her that she and the barges were to cross her bows. Her con-

sent must be considered as a waiver of articles 19, 20, and 23 of the Inland Rules (Act June 7, 1897, c. 4, 30 Stat. 96 [U. S. Comp. St. 1901, p. 2883]), which provides that the vessel which has the other on her starboard side should keep out of the way of the other. It became the positive duty of the Franklyn to direct her course astern of the Norfolk, and the reciprocal obligation upon the tug was to starboard and go to the left of the channel. On this point the proofs are that the Albatross steered to port on exchange of the two-blast signals as much as she dared, and was prevented from going farther to the eastward of the channel because of the close proximity of a schooner abreast of the Pocomoke, and sailing in the same direction. On the record I am unable to attribute negligent navigation to the Albatross, and the rule of sole responsibility may safely be applied. The Oregon, 158 U. S. 186, 15 Sup. Ct. 804, 39 L. Ed. 943; The Umbria, 166 U. S. 404, 17 Sup. Ct. 610, 41 L. Ed. 1053; The Lowell M. Palmer, 142 Fed. 937, 74 C. C. A. 107. Even though the steamtug was not navigated to the eastward as much as was possible to do, her failure did not contribute to the collision, as the Franklyn was neither prejudiced nor embarrassed in her movements by any such omission.

It is also claimed at the trial that if there was negligence it must be attributed to the pilot, McLaughlin, and not to the Franklyn, and that in an action in personam the respondent cannot be held liable for the acts or omissions of a compulsory pilot. Inasmuch, however, as the sole fault was primarily due to the mistake of the wheelsman, as has been indicated, this question need not be passed upon.

A decree may be entered for libelant, with costs, against the respondent, and a reference may be had to a commissioner to ascertain the damages sustained, while the petition of the Palace Shipping Co., Ltd., against the steamtug Albatross, must be dismissed.