SOCIETE DES CHARGEURS DE L'OUEST SOCIETE ANONYME v. UNITED STATES.

MORINEAUX v. SAME.

THE BASSE INDRE.

THE HOUSATONIC.

District Court, S. D. New York.
Aug. 7, 1930.

Bigham, Englar, Jones & Houston, of New York City, Oscar R. Houston and William J. Nunnally, Jr., both of New York City, of counsel), for libelants.

Charles H. Tuttle, U. S. Atty., of New York City (Horace M. Gray, of New York City, and F. Leo Shea, of Brooklyn, N. Y., of counsel), for respondent and cross-libelant.

WOOLSEY, District Judge.

I hold both the Housatonic and the Basse Indre to blame for the collision hereinafter described.

I. The jurisdiction of this court in this suit is based on a special act of Congress, Private Law No. 43, enacted by the Sixty-Ninth Congress in its First Session and approved by the President on May 7, 1926 (44 Stat. 1470).

The necessity for a special act to found jurisdiction was due to the decision in the case of The Western Maid, 257 U. S. 419, 42 S. Ct. 159, 66 L. Ed. 299, for at the time of the collision the Housatonic was being operated by the United States Navy as a troop transport and, consequently, was a public vessel of the United States within the ambit of the principles involved in that case.

II. The collision which is the subject-matter of this suit occurred at 4:20 a. m., according to the clock on the Housatonic, and 6:05 a. m., according to the clock on the Basse Indre—for the sake of convenience I shall hereinafter use the Housatonic time—on May 23, 1919, in the Bay of Biscay, three or four miles to the northwestward of Point des Poulains Lighthouse, which is at the north end of Belle Ile off the Port of St. Nazaire and the mouth of the River Loire.

Owing to the delay in getting the necessary jurisdictional legislation, the case was tried ten years after the collision when the memory of the witnesses, at least as to details, was dim.

The resurrection of the necessary evidence has been principally accomplished by introducing, through interrogatories or on cross-examination, the evidence given by each witness on investigations had by the American and French authorities respectively shortly after the collision.

The result is that the facts, although thus ingeniously reconstructed, suffer from some lacunæ, and a decision of the case is made far from easy in spite of the ingenuity and diligence of counsel on both sides. This difficulty has not been helped by the fact that the course of the Housatonic given in her log is wrong, and that the Basse Indre's log was never written up because it was lost when she was beached, as hereinafter mentioned, after the collision.

III. The Housatonic, which is a single-screw steamship of 7,000 tons burden, approximately 391 feet long, was proceeding light from New York to repatriate troops, and was approaching St. Nazaire to the northward of Belle Ile when the collision happened.

The Basse Indre, which was a small single-screw steamship of 2,000 tons burden, between 180 and 200 feet long, and of a draft, when loaded as she then was with a cargo of 1,200 tons of pit props, of 15 feet forward and 16 feet aft, was outward bound from Chantaney Les Nantes in the River Loire, to Newport, England.

The two vessels sighted each other just before sunrise, so lights do not play any part in this case. The weather was clear, there was not any wind, and the sea was smooth.

The course of the Housatonic when the vessels first sighted each other, given as 335 degrees true in the Housatonic's log, is admittedly wrong. Judging from the definitely known course of the Basse Indre, 295 degrees true, the bearings of the Housatonic from her, and the general direction in which the Housatonic was going, counsel for the Basse Indre contends that the Housatonic's course may fairly be assumed to have been 63 degrees true, or approximately NE by E½E. I agree to this and so find.

The Basse Indre had dropped her pilot half or three-quarters of an hour before she sighted the Housatonic, and her course, which she then laid for Penmarch, further up the French coast, and on which she continued until just before the collision, was

295 degrees true, or approximately NW by W¾W.

With the Housatonic's course thus fixed at 63 degrees true, it will be seen that when the two vessels first sighted each other the angle between the starboard side of the Housatonic, which was then the burdened vessel, and the port side of the Basse Indre, then the privileged vessel, was about 128 degrees; for the course of the Basse Indre was about 65 degrees to the westward of true north and that of the Housatonic about 63 degrees to the eastward of true north.

The Basse Indre was making only about 8 knots per hour or about 800 feet per minute, whilst the Housatonic was making 12 knots per hour, or about 1,200 feet per minute.

As the situation developed, it became apparent that they would approach the point where their courses would intersect so nearly at the same time as to make the master of each vessel feel that there would be a collision if the other vessel did not change her course.

This fact indicates, as their speeds were confessedly unchanged up to this point, that when they first observed each other the Housatonic must have been further distant than the Basse Indre from the point of intersection of their courses as 12 is to 8; that is, half again as far.

When, therefore, the Housatonic was six miles from the point of intersection of their courses, the Basse Indre was four miles therefrom—the distance between the two vessels was about seven miles—and thus the triangle made by lines drawn between the two vessels and from each to the point of intersection of their respective courses was a scalene triangle.

I find that this was substantially the geometry of the situation when the vessels first saw each other, and that at that time the Basse Indre bore about two points on the starboard bow of the Housatonic and that the Housatonic bore about two and a half points on the port bow of the Basse Indre.

After thus first sighting each other, when they were about seven miles apart, the two vessels continued at full speed on the respective courses above given, except for the fact that the Housatonic slightly varied her course from time to time as she was picking her way through a fleet of fishing vessels and looking for a pilot boat to take her into St. Nazaire.

The bearing of each vessel to the other remained, therefore, substantially unchanged —a circumstance which of itself is a danger signal. Cf. International Rules IV—Steering and Sailing Rules-Preliminary Note (33 USCA § 101).

Five minutes before the collision, at about 4:15 a. m., up to which time the Housatonic had not changed her course, the Housatonic blew a single-blast signal, indicating that she was directing her course to starboard and would pass the Basse Indre port to port and go astern of her.

On the Housatonic's bridge at this time were her captain, her third officer, two lookouts, one in each wing of the bridge, and the helmsman. These witnesses all testified that a single-blast reply signal was blown by the Basse Indre, and in this they are confirmed by the quarter master, Condon, who was not on watch but who was still about the deck.

Only one of the witnesses for the Basse Indre testified to this reply by a single blast from her. That was the boatswain Francois Puren, then in charge of her navigation, who says on direct examination, in a somewhat unresponsive answer to an interrogatory:

"The first time, the Housatonic whistled at a distance of about three miles and the Basse Indre replied at about the same distance."

It is true that later, on cross-examination, he denied this answering whistle, but too late, for the truth was out.

With the courses of the two vessels as they were, it was unnecessary for the Basse Indre to reply to the Housatonic's signal, for the Basse Indre as the privileged vessel did not have to change her course or her speed.

It was not unnatural, however, for Puren thus to answer the Housatonic's single blast with a similar signal, even if he knew the duty it imposed on him, for there was ample sea room to enable the Basse Indre to go to starboard. But Puren was not a licensed man, and perhaps he may have been laboring under the mistaken impression, which I believe is not uncommon among persons far higher placed than he, that such a signal from a privileged vessel in a situation like this means merely an acquiescence in and understanding of the burdened vessel's proposed course, and does not involve any duty on the part of the privileged vessel to make a change in her own course corresponding to her signal.

But, whatever may have been in Puren's mind, I am satisfied that the Basse Indre answered the Housatonic's single blast with a single blast as the Housatonic's witnesses have testified, and I so find.

I find, however, that at this time, 4:15 a. m., the vessels were not three miles apart, as Puren says, but probably somewhat less than a mile and a half apart.

I arrive at this distance between the vessels at 4:15 a. m. by taking the angle of their courses 128 degrees, assuming that they would have reached the intersection of their courses at 4:20 a. m. (the time when they collided), if they had continued their courses and speeds unchanged, and work back to their respective positions from the point of intersection minute by minute according to their respective speeds of 1,200 and 800 feet per minute until I find their position at 4:15 a. m.

At that time the Housatonic was about 6,000 feet from the intersection of their courses, the Basse Indre 4,000 feet therefrom, and the distance between the two vessels was about 7,400 feet.

By the same process I find that three minutes later, at 4:18 a. m. (two minutes before the collision), the Housatonic was 2,400 hundred feet and the Basse Indre 1,600 feet from the intersection of their respective courses and that the distance between the vessels was then a little less than 3,000 feet.

This estimate of distance is, of course, approximate only, because the collision occurred before the vessels got as far along their courses as the intersection thereof, but it is far more accurate, I feel sure, than the estimates of any of the witnesses, and in any event this method of reconstructing the situation is, I believe, correct in theory.

It seems incredible that, in such a situation, in plain sight of each other and with means of intercommunication by whistle and of changing both their speeds and their courses, the two vessels did not succeed in passing each other safely. But they did not.

IV. Every accident, however astonishing, can be intelligibly explained in some way. The difficulty usually is that the court cannot lay hands on the explanation within the four corners of the record. However, after long reflection, I have come to the conclusion that the real explanation of this singularly inexcusable collision is definitely to be found in the evidence of Captain Burns, of the Housatonic, admitted in the answer of the second interrogatory addressed to the United States by the owners of the Basse Indre as having been given by him five days after the collision.

Captain Burns was being examined at St. Nazaire on May 28, 1919, by a Naval Court of Inquiry of the United States regarding the collision, and after testifying, to the evident amazement of the court, that when the Basse Indre was two miles away he had blown her a single-blast whistle and on receiving a prompt reply had ordered a *hard right rudder*, he testified further most significantly as follows (italics mine):

"8-Q. Do you ordinarily give the order 'hard over rudder' except in rather urgent cases? A. No, sir.

"9-Q. Then you must have considered this rather an urgent case? A. Well, it was. The ship was not in a river or harbor, and in one sense he was off my starboard bow and *he did not have to answer me but he did answer.*
\* \* \*

"12-Q. In your opinion, if the French ship Basse Indre had held her course and speed would you have cleared with right rudder? A. *If she had kept on her course and speed I do not think she would have cleared, but he answered me and that distinctly states that when he blows his whistle he will put his rudder to the right.*

"13-Q. *Then she would not have cleared if she had maintained her course and speed? A. I do not think she would.*"

This evidence from the master of the Housatonic, who was navigating her at the time of the collision, establishes these two facts to my satisfaction:

First, that, though his was the burdened vessel, he had drawn it so fine in his approach to the privileged vessel's course that he could not clear her with a hard right rudder if she obeyed the rules and maintained her course and speed, and

Second, that he rightly assumed that the privileged vessel's concurrence with his signal meant that she had agreed to change her course to starboard also.

Thus it seems to me that out of the mouth of the Housatonic's captain, in evidence given shortly after the collision and just after he had signed his logs, we have proof of his own fault in not porting promptly and of the fault of the Basse Indre in not directing her course to starboard after her single blast signal.

V. Article 28 of the International Rules (33 USCA § 113) for avoiding collision reads:

"The words 'short blast' used in this article shall mean a blast of about one second's duration.

"When vessels are in sight of one another, a steam vessel under way, in taking any course authorized or required by these rules,

shall indicate that course by the following signals on her whistle or siren, namely:

"One short blast to mean, 'I am directing my course to starboard.'

"Two short blasts to mean, 'I am directing my course to port.'

"Three short blasts to mean, 'My engines are going at full speed astern.' "

■ Therefore, when the Basse Indre and the Housatonic exchanged single-blast signals each was entitled to expect the other to port her helm at once, for each had agreed by her whistle to do so.

■ It was, of course, the Housatonic's duty under the rule to blow her single-blast signal and admittedly it was a proper signal. By her answer the Basse Indre advised the Housatonic that she had waived her position as the privileged vessel and was going to co-operate in such maneuvers as would enable the two vessels to pass safely; and the Housatonic by her signal advised the Basse Indre that she was then going under a right rudder and so would swing away from the Basse Indre's course.

■ There is, of course, nothing immutable in the position of a privileged vessel; a privilege may be foregone. Cf. The Socony No. 5, 285 F. 154, 155 (C. C. A. 2); Jersey City Stock Yards Co. v. Steamtugs Mary E. Meseck and John Arbuckle (D. C.) 42 F.(2d) 296, 1930 A. M. C. 1039; The Albatross (D. C.) 184 F. 363, 365, 366.

VI. I think that at the time of the exchange of single-whistle signals each vessel rightly thought that if its course were unchanged it would reach the intersection of their respective courses at approximately the same time, so each told the other it would give way. This was the Housatonic's duty and the Basse Indre's free choice.

This whistle agreement would have caused the vessels to go clear if each had implemented her promised maneuver promptly, but neither did what she had agreed to do.

Instead of promptly porting and thus closing in her masts so that the Basse Indre would have realized that she was carrying out the maneuver which she had indicated, and which it was her duty to perform, the Housatonic, owing either to bad judgment, or perhaps to too much reliance on her speed and maneuvering power, came too near the line of the Basse Indre's course before she started to go to starboard. Then she put her rudder hard right, i. e., helm hard over to port.

The fact that the Housatonic put her rudder *hard* right, as I find she did, when she started the maneuver indicates an inexcusable delay in doing so and also shows her realization of the necessity then of a quick starboard turn.

It has been demonstrated beyond any doubt by the tactical data secured on her trial trip that if the Housatonic had put her rudder hard right when she blew her single-blast signal, five minutes before the collision, she would have swung 180 degrees when going at 12 knots, and thus if she had ported when she should have ported she would have been far to the port side of the Basse Indre's course at 4:20 a. m.

What happened, I find, was that the Housatonic did not put her rudder right until about 4:18 a. m., when the vessels were less than 3,000 feet apart, as above shown, and just before the Basse Indre blew her two-blast signal. This was three minutes after the single-blast exchange; and as a result of this delayed maneuver those on the Basse Indre were not able to observe any change of the Housatonic's course by the closing in of her masts, and naturally assumed that the Housatonic had not put her rudder right, that she was going to cross the Basse Indre's bow, and that there would be a collision substantially at the point of intersection of their respective courses unless the Basse Indre turned to port under a left rudder.

At this time, however, the delayed swing of the Housatonic to starboard, though not yet apparent to the Basse Indre, had begun, and when, too late, the situation became clear to both vessels, it was hopeless, for the Housatonic was swinging to starboard and the Basse Indre to port.

The Housatonic then blew a second single blast after the Basse Indre's first signal of two blasts, and the Basse Indre repeated her signal of two blasts. When these contradictory signals were blown, the vessels were only a few hundred feet apart and consciously in the jaws of danger. Neither vessel was able to stop her swing in time to prevent collision, although each reversed its engines, with the result that when they came together the Basse Indre was almost stationary in the water and the Housatonic had considerably reduced her speed.

The position of the collision, as related to the original courses of the two vessels, was between one and two ship's lengths to the port side of the Basse Indre's original course, and about four ship's lengths on the starboard side of the Housatonic's original course. The

angle of the collision was 80 degrees between the starboard side of the Basse Indre and the port side of the Housatonic, whose stem penetrated halfway through the Basse Indre's engine room and dislodged her engines from their foundation.

The angle of the collision and the depth of the collision wound indicate that by their maneuvers just before collision the Basse Indre had turned almost at right angles to her previous course and that the Housatonic had turned about 100 degrees from her previous course; that, hence, the porting of her helm on the part of the Housatonic was about the same time as the starboarding of the Basse Indre; and that the Housatonic had considerable way on her when the collision occurred.

As a result of the collision the Basse Indre was so severely damaged that she had to be towed to shallow water and there beached.

VII. The fault on the Housatonic's part which contributed to cause the collision was that she did not go to starboard at once when she notified the Basse Indre that she would do so, but went too near the course of the Basse Indre and then attempted, by her hard right rudder at the last moment, to turn off suddenly and pass the Basse Indre on her port side.

On the other hand, if the Basse Indre had put her rudder right when she agreed to do so at 4:15 a. m., the situation would probably have cleared up promptly.

I think, as above indicated, that by answering the Housatonic's signal the navigator of the Basse Indre possibly supposed he was merely signifying his understanding that the Housatonic would port and go under the Basse Indre's stern, and that he did not realize that under article 28 (33 USCA § 113) his answer meant that he must also go to starboard. But, if my assumption be correct, that misconception cannot let her go free. A vessel which blows a whistle must, under article 28, act accordingly and the vessel to which the signal is blown is entitled to count on such action.

I find, therefore, that the concurrent faults of the two vessels—which were the underlying causes of the collision—were that, in breach of article 28 of the International Rules, neither vessel put her rudder right, i. e. ported her helm, at 4:15 a. m., when each told the other by her single-blast whistle that she was directing her course to starboard.

VIII. I am strongly urged by counsel for each vessel to hold the other vessel solely to blame. When, however, as in this case, without any adverse condition of wind or sea, with a visibility such as to enable them to sight each other at a distance of seven or eight miles, in broad water, unhampered by the sinuosity of any channel or by the proximity of land, two vessels, with their steering gears in good condition, come into collision, common sense is inhospitable to holding either vessel solely to blame.

On the evidence which I have before me in this case I should have to base such a decision on a chancering of possibilities which would be far too nice to be really dependable.

IX. An order consolidating these cases may be entered and an interlocutory decree providing for the assessment of damages in accordance herewith, but not carrying costs, may be presented for signature, on two days' notice.